### TAYLOR et al. v. HARNETT et al.

(Supreme Court, Appellate Term. February 3, 1899.)

1. AUCTIONEERS—RIGHT TO REFUSE BIDS.

An auctioneer has the right to refuse to accept a bid which is a trifling advance, where the sum offered is incommensurate with the actual known value of the property.

2. SAME.

On an auction sale of stock worth $170 per share, a bid of an advance of $1 per share over a bid of $110 is properly refused, as too trifling an ·advance.

3. SAME—REOPENING SALE—RIGHTS OF BIDDERS.

Stock was sold at auction at $110 per share, in spite of plaintiff's bid of $111, which had been refused as too small an advance. Plaintiff protesting, the sale was reopened, and a bid of $125 received. Plaintiff refused to bid further, claiming to be entitled to the stock under his former bid. *Held* that, the stock not having been sold to him, he could not complain of the reopening of the sale.

4. SAME—REFUSAL OF INTERMEDIATE BID.

He could not complain of the refusal to accept his bid, since a higher one than his was received on the resale.

Appeal from municipal court, borough of Manhattan, First district.

Action by Talbot J. Taylor and another against Richard V. Harnett and another. There was a judgment for plaintiffs, and defendants appeal. Reversed.

Argued before BEEKMAN, P. J., and GILDERSLEEVE and GIEGERICH, JJ.

Ira D. Warren, for appellants.

H. Snowden Marshall, for respondents.

BEEKMAN, P. J. The plaintiffs claim that they were the highest bidders at an auction sale of certain stock, which was conducted by the defendants, who are co-partners, engaged in business as auctioneers; that the latter refused to accept their bid, and awarded the property to the next lowest bidder; and that, in so doing, they violated a duty which they owed, as a matter of law, to the plaintiffs, as bidders at the sale, for which they are liable in damages. The justice below rendered judgment in favor of the plaintiffs. On the trial there was such a conflict upon the facts that we should not undertake to disturb the findings of the trial court in that regard. Assuming them to have been as testified to by the plaintiffs' witnesses, we must, then, take it that the defendants advertised the sale at public auction of 10 shares of Electric Gas Company stock, of the par value of $100 each, to be held on January 4, 1898, at 12:30

o'clock, at the salesroom, No. 111 Broadway, in this city. A copy of the advertisement, in the shape of a printed handbill, or "Catalogue," as it was called, was received by the plaintiffs from the defendants; and it was in pursuance of this notice that the former attended the sale at the time and place stated, for the purpose of bidding on the stock. The terms of sale, as expressed in the catalogue, were as follows:

"10 per cent. at the time of sale, and the balance before 12 o'clock. Wednesday, January 5, payable to the auctioneers. at their office, Nos. 71 and 73 Liberty street, in funds current at the New York Clearing House. No checks received in payment unless certified and approved. Owners reserve the right to bid at this sale."

The sale was personally conducted by Mr. Donald, one of the defendants, and the bidding for the plaintiffs was made by one Alexander K. Taylor, their agent. When it was opened, Mr. Taylor offered bids under par, which were refused; the auctioneer stating that none under par would be entertained. Mr. Taylor then bid that amount, whereupon a bid of 110 was made by some other bidder, which was followed by an offer from Mr. Taylor of 111. This the auctioneer refused to receive, saying, "I won't accept one point raised on stock," and again cried, "I am bid 110." Mr. Taylor again bid 111, whereupon the auctioneer said, "Sold at 110," and dropped his hammer. According to Mr. Taylor's testimony, which it must be presumed was credited by the justice, the following thereupon took place between himself and the auctioneer:

"I immediately went up, and said, 'Here is my card, Taylor & Company; that is my stock.' He said, 'That is not your stock.' I said, 'It is, absolutely.' He says, 'I will give you a chance to buy the stock.' He says, 'I am bid 125.' I said, 'I advise you not to sell my stock; I bought the stock at 111.' With that he went on with another deal. First he scratched his pencil through something."

The witness was then further interrogated as follows:

"Q. State, when he made the statement that he was bid 125, whether he dropped his hammer, and declared the stock sold. A. No, sir; I warned him not to sell stock which was mine. He did not declare it sold. He just ran his pencil through the line. I went immediately to the office."

This sufficiently presents the facts on which the plaintiffs rely in support of the judgment in their favor. Their claim is that, as a matter of law, where an auctioneer advertises a sale at public auction, and in response to this invitation bidders attend, an implied contract arises between them that the property will be knocked down to the highest bidder, for a breach of which an action for damages will lie against him at the suit of such bidder. There is no case in this state which is directly in point upon the proposition advanced. The question, however, seems to have been determined in England in the case of Warlow v. Harrison, 29 Law J. Q. B. 14, in the exchequer chamber, error from the queen's bench. There it was held, as the headnote expresses it, that, if an auctioneer inserts in the conditions of a sale by auction that the property is to be sold "without reserve," he, by so doing, contracts with the highest bona fide bidder that the sale shall be without reserve; and the

contract is broken if, during the auction, a bid is made by or on behalf of the owner of the property sold, and in such case the auctioneer is liable to an action at the suit of the highest bona fide bidder. In the course of his opinion, Martin, B., says:

"In a sale by auction there are three parties, namely, the owner of the property to be sold, the auctioneer, and the portion of the public who attend to bid, which, of course, includes the highest bidder. In this, as in most cases of sale by auction, the owner's name was not disclosed; he was a concealed principal. The names of the auctioneers, of whom the defendant was one, alone were published, and the sale was announced by them to be 'without reserve.' This, according to all the cases, both at law and in equity, means that neither the vendor, nor any person on his behalf, may bid at the auction, and that the property shall be sold to the highest bidder, whether the sum bid be equivalent to the real value or not. For this position, see the case of Thornett v. Haines [15 Mees. & W. 367]. We cannot distinguish the case of an auctioneer putting up property for sale upon such a condition from the case of the loser of property offering a reward, or that of a railway company publishing a time table stating the times when, and the places at which, the trains run. It has been decided that the person giving information advertised for, or a passenger taking a ticket, may sue as upon a contract with him. Denton v. Railway Co. [5 El. & Bl. 860]. Upon the same principle, it seems to us that the highest bona fide bidder at an auction may sue the auctioneer as upon a contract that the sale shall be without reserve. We think that the auctioneer who puts property up for sale upon such a condition pledges himself that the sale shall be without reserve, or, in other words, contracts that it shall be so, and that this contract is made with the highest bona fide bidder, and, in case of a breach of it, that he has a right of action against the auctioneer."

The reasoning of the court fairly supports the claim made by the plaintiffs that this decision determines the existence of a contractual relation between the auctioneer and bidder, which imports a duty on the part of the former to sell according to the terms of sale, either expressed or necessarily to be implied from the very nature of the sale itself. The fundamental principle of the decision is that, in the absence of stipulations to the contrary, the auctioneer is bound, as between himself and the attending bidders, to award the property to the highest bona fide bidder. Of course, this presupposes that the bid is one which the auctioneer either received or should have received.

While we concede all the respect that is due to the highest authority of the court from which this decision emanated, it is not, of course, a controlling authority here. The question is still an open one, which, however, we see no necessity for deciding, in view of the fact that, assuming the law to be as the above-cited case seems to declare, we are still of the opinion that, upon the facts of the case before us, the plaintiffs have not established such a breach of duty on the part of the defendants as to support a recovery. The contention of the plaintiffs is, as we have seen, that there was such a breach of duty in the refusal of the auctioneer to accept their bid of 111 for the 10 shares of stock, which was an advance of $1 a share over the previous bid, and that they were, therefore, the highest bidders, and consequently entitled to have the property knocked down to them. Under this view, of course, any advance, however slight, should have the effect claimed for it; but the trouble with the argument is that it fails to notice the modifying effect of an-

other duty which the auctioneer owes to his principal. He is bound to use all reasonable efforts, consistent, of course, with fairness, to make the sale a success, and to induce persons attending the same to bid. In short, he is there for the purpose of stimulating competition for the property, without which such a sale must almost always prove a failure. The necessity, then, for the existence of a certain measure of discretion on his part with respect to procedure on the sale is manifest. That he has such power cannot reasonably be disputed, the only difficulty arising being to affix an exact specification of its limits. It is, we think, well settled that he may refuse a bid tendered in bad faith, or proffered by a person who is insolvent or otherwise disabled from completing the purchase; otherwise the whole object of the sale might be defeated. Within the same reasoning comes the right, which we think he possesses, of refusing to accept trifling advances offered by bidders in the course of the sale, especially where that kind of bidding is initiated at the outset, and the sum so offered is utterly incommensurate with the actual known value of the property. It is reasonable to infer that bidding of that kind would have a depressing effect upon the sale. and tend to induce a belief on the part of others in attendance that the value of the property had been approximately reached. We see no reason, then, why it is not within the legitimate bounds of the discretion of the auctioneer to refuse to accept a bid which is little more than a nominal advance, and, considering the surrounding circumstances, is, in his judgment, likely to affect the sale injuriously.

Could it be seriously claimed that if a bidder should offer an advance of one cent the auctioneer would be bound to receive it? Certainly not. But this concession necessarily establishes the principle, and the only question in each case must therefore be whether, considering the surrounding circumstances, the power was reasonably exercised. In the case at bar the value of the stock was, as one of the plaintiffs testified, 170; and considering this fact and what took place at the sale, as above stated, we do not think it can be said that the auctioneer acted unreasonably in refusing to accept the advance of 1 per cent., which was offered.

But there is another consideration, also, which seems to dispose of the plaintiffs' claim. It will be remembered that, when their representative who was bidding for them demanded the stock at 111, the auctioneer, saying that he would give him a chance to buy it, reopened the sale, apparently erasing the record, and received a further bid of 125 from another. The plaintiffs, however, refused to assent to this, and declined to bid further; insisting that the stock was theirs because of their former bid of 111. Had the stock been knocked down to them at that price, their resistance to a reopening of the bidding would have been well founded; but, as it was, the only person who could have complained, but who seems not to have done so, was the bidder at 110, to whom the stock had been knocked down. Certainly, the plaintiffs cannot predicate any rights upon an act which they claim was void. As to them, the sale was still open; and when the auctioneer so announced, and a bid of 125 was re-

ceived, assuming that they had been the highest bidders before, they
were so no longer, and whatever claim they might before have had
entirely disappeared. For the reasons which we have given, we
think that the court erred in awarding judgment in favor of the
plaintiffs.

Judgment reversed, and a new trial ordered, with costs to the ap-
pellants to abide the event. All concur.