OPINION OF THE COURT
Martin Rodell, J.
The plaintiff herein seeks to recover a balance of rental payments remaining due under a lease agreement of a certain candle making machine. The matter was tried by the court without a jury.
The following facts are uncontroverted:
In August, 1976 the defendants purchased a certain "Hans Ktirschner” candle making machine for the sum of $14,950. This apparently was a new type of twin-spindle milling machine. The machine was able to simultaneously mill the tips and bases of candles in a single operation, whereas the conventional machines could mill only one end at a time. The defendants were given the machine at a special price as a means of introducing it to the American market. Before payment was made the defendant corporation began to encounter financial difficulties.
On January 11, 1977 the defendant corporation sold the machine to the plaintiff for the sum of $14,950; the proceeds of the sale were then turned over to the manufacturer. On that same date the plaintiff leased the said machine back to the defendant corporation Columbia Wax Products Co., Inc. Said lease was to run for a period of 60 months at $360.06 per month, making a total of $21,603.60. On that same date the defendant Henry Grupe executed his personal guarantee of *740 the lease payments. After 13 rental payments ($4,680.78) were made, the defendants defaulted. The defendant corporation went out of business in January, 1978. The defendant Henry Grupe retained possession of the machine, making some, but not exhaustive attempts, to sell it. In January, 1979 the plaintiff repossessed the machine and retained a duly licensed auctioneer to conduct a sale of the machine, in accordance with and pursuant to the terms of the said lease agreement.
The sale was noticed by publication in the New York Times and by mailing notice of the sale to approximately 400 named candle manufacturers. Said list was supplied by the defendant Henry Grupe and was dated 1970. On February 7, 1979 the machine was sold at a public auction. Present at the auction were the auctioneer, a representative of the plaintiff, defendant Henry Grupe and one bidder representing Carolina Soap Co. Said Carolina Soap Co. bid $1,500 for the machine. The bid was refused. Thereupon the auctioneer, the representative of the plaintiff and the bidder retired to a conference behind closed doors, and an announcement was made that the sale had been negotiated for $2,000. The net proceeds of the sale amounted to $1,016.50.
Pursuant to the terms of the lease, the plaintiff seeks a judgment to recover the difference between the rentals owed and the net proceeds of the sale of the machine, namely $15,806.32, together with attorneys’ fees.
The plaintiff avers in its complaint that the value of the machine at the time of the sale was $17,500.
The defendant Henry Grupe presented an expert to the court, one Heinz Verhaegen, the exclusive dealer of Hans Kürschner in the United States. He testified that the machine in question if brand new would sell in today’s market for about $29,000, and that a used machine of this type in good operating condition would be worth 80% of the said amount, or approximately $23,200. He stated that the machine in question was in good working order when he last saw it in early 1978.
The defendant Grupe contends that the sale was commercially unreasonable in that: the notice did not fully and adequately describe the machine which he claims is unique; that the outdated list of possible purchasers supplied by the said defendant was not updated by the auctioneer; that the sale was held on a day upon which inclement weather and a weather forecast of potentially hazardous conditions had an *741 effect upon the attendance at the sale; and that the terms of the sale were totally inadequate. The defendant Grupe further contends that he informed both the auctioneer and the plaintiff’s representative at the sale that the bidder present at the auction would spend as much as $11,000 for a single spindle machine (which was inferior to the machine in question).
Subdivision (3) of section 9-504 of the Uniform Commercial Code states as follows:
"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.” (Emphasis supplied.)
"[E]very aspect of the disposition, including the method, manner, time, place and terms must be commercially reasonable.” (Uniform Commercial Code, § 9-504, subd [3].)
"[W]e require some affirmative showing that the terms of the disposition were, in fact, commercially reasonable and hold that, in the absence of such a showing, we will be compelled to deny recovery in a suit for a deficiency judgment pursuant to subdivision (2) of section 9-504 of the code * * * marked discrepancies between the disposal and sale prices are a signal for close scrutiny.” (Central Budget Corp. v Garrett, 48 AD2d 825, 826.)
The statute requires that every aspect of the disposition, including method, manner, time, place and terms be commercially reasonable.
The applicability of article 9 of the Uniform Commercial Code to the instant matter is dependent upon whether the transaction herein is a secured transaction or an ordinary lease. It appears that as to this issue this is a case of first impression in this State.
Subdivision (37) of section 1-201 of the Uniform Commercial *742 Code defines a security interest as follows: "an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2-401) is limited in effect to a reservation of a 'security interest’. The term also includes any interest of a buyer of accounts or chattel paper which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2-401 is not a 'security interest’, but a buyer may also acquire a 'security interest’ by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest’ but a consignment is in any event subject to the provisions on consignment sales (Section 2-326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.”
While the lease in the instant matter does not contain an option to buy, as set forth in the above section, the following clauses of the lease are germane to the court’s determination regarding the nature of the transaction. Paragraph 8 of the lease sets forth the following: "insurance. Lessee shall keep the Equipment insured against all risks of loss or damage from every cause whatsoever for no less than the greater of actual cash value or the aggregate amount of all unpaid rentals as of any time for the entire term of this Lease, without deductible and without co-insurance. * * * Lessor shall be the named loss payee with respect to damage or loss to the Equipment and shall be named co-insured on the public liability insurance. All insurance shall be with insurers and in a form satisfactory to Lessor; shall provide for at least thirty days advance written notice to Lessor before any cancellation or material modification thereof; shall waive any claims for premiums against Lessor; shall not be invalidated by any act or omission of Lessee and shall be evidenced by delivery of the policies or certificates thereof to Lessor, as requested by Lessor.”
Paragraph 11 sets forth the remedies in the event of de *743 fault, "remedies. If an Event of Default shall occur, Lessor may, at its option, at any time (a) terminate the lease (b) declare the entire amount of unpaid total rental for the balance of the term of this lease due and payable, whereupon Lessee shall become obligated to pay to Lessor forthwith, the total amount thereof less, if any Equipment is retaken by Lessor, the net proceeds received by Lessor from any sale or re-rental of the Equipment after deduction of all expenses of sale or re-rental, and (c) without demand or legal process, enter into the premises where the Equipment may be found and take possession of and remove the same, and all rights of Lessee in the Equipment so removed shall terminate absolutely. Lessor may, at its option, ship, store and repair all Equipment so removed and sell any such Equipment at a private or public sale(s). Lessee shall also be liable for and shall pay to Lessor all expenses incurred by Lessor in connection with the enforcement of any of Lessor’s remedies, including all expenses of repossessing, storing, shipping, repairing, selling or otherwise disposing of the Equipment and legal expenses including reasonable attorney’s fees of 20% (if permitted by law, or if prohibited by law such lesser sum as may be permitted) of the total unpaid rental for the balance of the term of this lease.”
The Federal courts and appellate and trial courts of several of our sister States have rendered persuasive decisions in regard to matters similar to that presently before this court.
The fact that the lessee is required to maintain insurance coverage upon leased equipment indicates that the transaction is a secured transaction and not a true lease. (Matter of Tillery, 571 F2d 1361.)
Where the lessor was not in the business of leasing the equipment in question and merely purchased the equipment desired by the lessee, the nature of the transaction indicates that the lease was actually a secured transaction. (Citizens & Southern Equip. Leasing v Atlanta Fed. Sav. & Loan Assn., 144 Ga App 800.)
The fact that the rentals required to be paid by the lessee exceed the purchase price is an indication that the transaction is a sale and that the lease creates a security interest. (National Equip. Rental v Priority Electronics Corp., 435 F Supp 236.)
A provision for the sale of the leased property upon default and the liability of the lessee for any deficiency in the total *744 rent in excess of the sale proceeds indicates that the transaction is a secured transaction. (American Lease Plans v Cardin, 558 SW2d 325 [Mo].)
The conclusion is inescapable that the lease created a security interest when the entire balance would be accelerated upon default and the lessee would be liable for any deficiency on the sale of the property. (Computer Sciences Corp. v Sci-Tek Inc., 367 A2d 658 [Del].)
The plaintiff by exercising its option to sell the equipment pursuant to paragraph 11 of the lease has brought the transaction within the purview of subdivision (3) of section 9-504 of the Uniform Commercial Code. It has placed the defendant in that class of debtors which the Legislature sought to protect by its enactment of the statute. In view of the facts presented the court finds that it was the intent of the parties to enter into a security transaction and that the commercial reasonableness provision of subdivision (3) of section 9-504 of the Uniform Commercial Code is applicable.
The court finds that the marked discrepancy in the conceded value of the machine ($17,500), and the sale price raises a serious question as to the commercial reasonableness of the sale. The court finds that this issue must be resolved in favor of the defendant. The court further finds that the method and manner in which the disposition of the machine was made is at the least questionable.
An auctioneer may in the exercise of his discretion refuse to accept a bid when it would constitute a virtual sacrifice of the property to accept such bid. He could either adjourn the auction or withdraw the property. (Ann. 37 ALR2d 1049, 1051.)
An auctioneer has a right and duty to withdraw property that is about to be sacrificed at a grossly inadequate price. (Bean v Kirkpatrick, 105 Ga 476.) He has the right to refuse to accept a bid which is a trifling advance where the sum offered is incommensurate with the actual known value of the property. (Taylor v Harnett, 26 Misc 362.)
Weighing all of the facts and circumstances attendant to the transaction herein, the court finds that the plaintiff has failed to sustain its burden of proving that every aspect of the disposition of the machine in question was commercially reasonable, as required by section 9-504 of the Uniform Commercial Code. In the absence of such proof the court is *745 compelled to deny recovery in a suit for a deficiency judgment. (Central Budget Corp. v Garrett, 48 AD2d 825, supra.)
Accordingly, the complaint is dismissed.