871 F.2d 270
 1989 A.M.C. 1232, 8 UCC Rep.Serv.2d 1
 Thomas J. MATTHEWS and Kathleen Matthews,
Plaintiffs-Appellees-Appellants,
v.
CTI CONTAINER TRANSPORT INTERNATIONAL INC., et al.,
Defendants-Appellants-Appellees.
 Nos. 460-464, Docket 88-7571, 88-7573, 88-7659, 88-7667, 88-7689.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 21, 1988.
Decided March 23, 1989.
 
 Norman E. Frowley, New York City (Gladstein & Isaac, Michael Stern, of counsel), for defendants-appellants Barbara O'Connor and Dennis O'Connor.
 Michael D. Martocci, New York City (Martocci & Burns, Howard W. Burns, Jr., of counsel), for defendant-appellant Compania Trasatlantica Espanola, S.A.
 Michael Conforti, New York City (Leahey & Johnson, P.C., Peter James Johnson, of counsel), for defendant-appellant Interpool, Ltd.
 Alexander V. Sansone, New York City (Hogan, Jones & Parisi, P.C., John M. Downey, of counsel), for defendants-appellants-appellees CTI Container Transport Intern. Inc. and Gelco CTI Container Corp.
 Joseph P. Napoli, New York City (Morris J. Eisen, P.C., Arthur M. Luxenberg, Kenneth A. Schachter, of counsel), for plaintiffs-appellees-appellants Thomas J. Matthews and Kathleen Matthews.
 Myra Needleman, New York City (Sheft & Sweeney, Leonard A. Sheft, of counsel), for third-party defendants-appellees Chaco Co. and Hubsport Co.
 Lester Schwab Katz & Dwyer, New York City (Steven B. Prystowsky, Eric A. Portuguese, of counsel), for defendants-appellants Grato & Sons Trucking and Raymond Rodino.
 Before FEINBERG, NEWMAN and ALTIMARI, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Interpool, Ltd., Barbara and Dennis A. O'Connor, Grato & Sons Trucking (Grato) and Raymond Rodino appeal from a judgment entered against them in the United States District Court for the Southern District of New York, Miriam Goldman Cedarbaum, J., after a jury trial. Compania Trasatlantica Espanola, S.A. (Spanish Lines) also appeals from the judgment after a simultaneous bench trial. The judgment awarded Thomas J. Matthews damages against appellants for injuries sustained in a collision, and Kathleen Matthews damages for loss of the services of her husband. In addition, Thomas and Kathleen Matthews appeal from the district court's dismissal of their complaint against two other defendants. For the reasons given below, we affirm the judgment of the district court, with one modification discussed below.
 
 Background
 
 2
 This action arises out of an automobile accident in Jericho, New York on October 24, 1985 between an automobile and a tractor trailer. Rodino, the driver of the tractor trailer, drove through a red light and "broadsided" the automobile driven by Dennis O'Connor as it emerged from an office complex and proceeded through an intersection governed by a green light. Thomas Matthews, who was a passenger in a car driven by O'Connor, suffered serious brain damage and other injuries as a result of the accident. The tractor trailer consisted of three separate parts: a tractor, a trailer or chassis, and a container that rode on top of the chassis. Each part was owned, or in the control of, a separate party or parties.
 
 
 3
 In November 1985, plaintiffs Thomas Matthews and his wife Kathleen sued Rodino and Dennis O'Connor for negligent operation of their vehicles. Plaintiffs also sued Grato, as the owner of the tractor; Interpool and Spanish Lines, as the owners of the chassis; CTI Container Transport International, Inc. (CTI) and Gelco CTI Container Corp. (Gelco), as the owners of the cargo container riding on the chassis; and Barbara O'Connor, as the owner of the automobile in which Thomas Matthews was a passenger. Some of these defendants also filed cross-claims against each other, and all of them impleaded as third party defendants Hubsport Company (Hubsport) and Chaco Company (Chaco)[1], the owners and maintainers of the office complex from which the O'Connor vehicle had emerged at the time of the accident.
 
 
 4
 In January 1987, CTI and Gelco moved to dismiss the claims against them. In March 1987, the district court granted the motion, finding that a container is not a vehicle under Sec. 388 of the New York Vehicle and Traffic Law (NYV & TL) and, therefore, the owner of the cargo container could not be held vicariously liable for the negligence of the driver of the tractor and chassis carrying the container.
 
 
 5
 In June 1987, Interpool twice moved for summary judgment, claiming that it was not vicariously liable for the accident because it was not an "owner" of the chassis within the meaning of Sec. 388 of the NYV & TL. The district court denied the first motion from the bench in order to allow the parties to complete discovery on the issue of whether Interpool was an "owner" of the chassis. In July 1987, after discovery, the district court denied the motion again, holding that Interpool's financing arrangement gave it effective ownership of the chassis.
 
 
 6
 Plaintiffs' claims against all of the remaining defendants other than Spanish Lines were resolved after trial by a jury. The case against Spanish Lines, which comes within the definition of a "foreign state" under the Foreign Sovereign Immunities Act (FSIA), was tried by the court pursuant to 28 U.S.C. Sec. 1441(d).
 
 
 7
 The jury rendered its verdict in June 1988, awarding $7 million to Thomas Matthews. Judgment was entered against Rodino, Grato, Barbara O'Connor, Dennis O'Connor and Interpool. In its answers to a series of questions, the jury found that Thomas Matthews was entitled to damages of $7 million, that Rodino and Dennis O'Connor were 82% and 18%, respectively, at fault for the accident and that third-party defendants Hubsport and Chaco were not liable. The jury also rendered a verdict of $1 million in favor of Kathleen Matthews. This sum was later reduced to $400,000 by the court.
 
 
 8
 In the simultaneous bench trial against Spanish Lines, the district judge made her own findings of fact and conclusions of law, which differed in significant respects from the jury verdict. The court found that Thomas Matthews was entitled to damages of $4,783,150, a figure over $2 million less than the jury verdict against the other defendants. The components of this total, as found by the court, were: $3,883,150 for future lost earnings, $300,000 for physical pain and suffering and loss of enjoyment of life to date, $300,000 for future physical pain and suffering and permanent diminution of the enjoyment of life, and $300,000 for past and future depression and mental anguish. The court found Rodino 100% responsible for the accident, and Dennis O'Connor not negligent. The judge also determined that under the terms of the lease agreement for the chassis, Spanish Lines has a contractual obligation to indemnify Interpool for the amount of the judgment against it and that O'Connor may obtain contribution from Spanish Lines but in an amount not to exceed Spanish Lines' total liability, as determined by the court. The court awarded Kathleen Matthews $300,000 for the lost services of her husband.
 
 
 9
 Because there are so many parties in this case, we will not refer hereafter to any as "appellant" or "appellee" but only by their names. For convenience, we will discuss the principal issues in roughly the chronological order they were decided in the district court, not in their order of relative importance.
 
 Discussion
 I. Pre-trial Motions
 
 10
 A. The Motion to Dismiss in Favor of CTI and Gelco
 
 
 11
 Matthews[2] and O'Connor[3] argue that the district court erred in finding that CTI and Gelco were not owners of a vehicle subject to vicarious liability under NYV & TL Sec. 388. Their theory is that since the New York statute makes the owner of a trailer liable for the negligence of the trailer's driver, the statute should also make the owners of the container here liable for the negligence of the driver of the trailer. As indicated below, the "owners" of the trailer (or chassis) were Interpool and Spanish Lines. CTI and Gelco owned only the container, and they argue that containers are not defined in the statute as trailers, are not registered or insured as trailers, and are, in effect, simply cargo.
 
 
 12
 The owner of a trailer is subject to vicarious liability under New York Law. NYV & TL Sec. 388(2). A trailer is defined as "[a]ny vehicle not propelled by its own power drawn on the public highways by a motor vehicle...." NYV & TL Sec. 156. A container has neither wheels nor axles and cannot be "drawn" by itself "on the public highways by a motor vehicle." Cf. People v. Guilianti, 10 N.Y.2d 433, 436, 224 N.Y.S.2d 4, 179 N.E.2d 850 (1962) (presence of wheels on van in shape of trailer and used as a field office indicated capability to be drawn on highway). Matthews and O'Connor have not cited, and we have not found, any persuasive New York authority equating a cargo container with a trailer. We are nonetheless offered policy reasons for stretching the coverage of the NYV & TL to include a container, thereby offering further financial protection to those injured on the highways of New York. Judge Cedarbaum stated that she could not find "any evidence that the legislature intended that the definition of trailer include a container that was placed on top of a trailer" and observed that she should not "legislate for the State of New York." Whatever we might think of the policy arguments were we legislators, we agree with the district judge.
 
 
 13
 B. Denial of Interpool's Summary Judgment Motion
 
 
 14
 Interpool argues that it is not an "owner" of the chassis and cannot be held vicariously liable to Matthews for the negligence of Rodino, the driver of the truck and chassis. Interpool claims that it was simply an intermediary between the title-holder, the First National Bank of Evanston, Illinois, and the lessee with exclusive use and possession, Spanish Lines.
 
 
 15
 New York law defines the "owner" of a vehicle as follows:
 
 
 16
 A person, other than a lien holder, having the property in or title to a vehicle or vessel. The term includes a person entitled to the use and possession of a vehicle or vessel subject to a security interest in another person and also includes any lessee or bailee of a motor vehicle or vessel having the exclusive use thereof, under a lease or otherwise, for a period greater than thirty days. NYV & TL Sec. 128.
 
 
 17
 Interpool argues that it does not fall within any of the three categories of ownership defined in the statute. The district court agreed with Interpool as to the third category, but nevertheless held that Interpool was covered by the statute.
 
 
 18
 In August 1980, Interpool entered into a long-term "Equipment Lease Agreement" concerning the chassis with First National Bank and Trust Company of Evanston, Illinois, which holds the title of the chassis in trust for the International Paper and Leasing Corporation. Pursuant to a long-term "Master Equipment Leasing Agreement" under which it obtained the chassis, Interpool then in turn leased the chassis to Spanish Lines for five years commencing in December 1980.
 
 
 19
 At first blush, the agreement between Interpool and First National Bank appears to be a pure lease, with no indicia of ownership by Interpool. It is denominated a "lease" and the parties are described as "Lessor" (First National Bank) and "Lessee" (Interpool). It calls for "rent payments," and the "title" to the vehicle is retained in the "lessor." But upon closer examination, we are satisfied that the transaction is in reality a "lease intended for security," In re Tillery, 571 F.2d 1361, 1365 (5th Cir.1978), and that Interpool therefore falls within the second category of ownership defined in NYV & TL Sec. 128.
 
 
 20
 In the analogous context of Uniform Commercial Code Sec. 1-201(37), courts have traditionally distinguished a true lease from a lease intended for security based on the facts of each case. International Paper Credit Corp. v. Columbia Wax Products Co., 102 Misc.2d 738, 424 N.Y.S.2d 827, 829 (Sup.Ct.), rev'd on other grounds, 79 A.D.2d 700, 434 N.Y.S.2d 270 (1980). Certain elements in the lease make it more likely that the "lease" between the First National Bank and Interpool was intended for security. Courts have considered it relevant that a lessor is not normally in the business of leasing the equipment in question. See id. 424 N.Y.S.2d at 830. That the lessee is required to maintain insurance coverage upon leased equipment also indicates that the transaction is a secured transaction and not a true lease. Id. (citing In re Tillery, 571 F.2d at 1366). Another test for whether a lease is intended for security is whether the purchase option price compared to the total lease rentals is nominal. National Equip. Rental, Ltd. v. Priority Electronics Corp., 435 F.Supp. 236, 238 (E.D.N.Y.1977). In addition, a provision for the sale of the leased property upon default and the liability of the lessee for any deficiency in the total rent in excess of the sale proceeds also indicates that the transaction is a secured transaction. International Paper Credit Corp., 424 N.Y.S.2d at 830.
 
 
 21
 Applying these criteria to the transaction at issue, we note that First National Bank is not ordinarily in the business of leasing the equipment in question. Under the lease, Interpool assumed the responsibility of purchasing insurance for the chassis. The briefs in this court also indicate that the total rental payments exceed the value of the equipment, and that Interpool has the option of purchasing the equipment at the end of the lease period for a nominal amount. Moreover, upon default, the lessor Bank has the option of selling the equipment and collecting from the lessee Interpool a deficiency payment amounting, in effect, to a loan acceleration provision to recover unpaid principal and interest. We also find two other clauses in the lease significant. Interpool assumed all liability for the chassis and agreed to indemnify the lessor Bank for any liability found on its part, and all "rent" payments were to be payable by Interpool to the lenders who financed the trustor's acquisition of the chassis.
 
 
 22
 On these facts, we believe that the leasing arrangement between Interpool and the Bank was a form of secured financing to facilitate Interpool's ownership of the chassis. See Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House, 59 Misc.2d 226, 298 N.Y.S.2d 392, 395 (Civ.Ct.1969), rev'd on other grounds, 64 Misc.2d 910, 316 N.Y.S.2d 585 (Sup.Ct.1970), where Judge Evans pointed out, in an analogous situation, how a complicated lessor-lessee relationship can, "in effect," transform a lessee into the actual purchaser:
 
 
 23
 Equipment leasing is a recent device whereby users of goods are enabled to have sole and exclusive use thereof for such periods of time as are economically beneficial to them at advantageous costs. It has become a widely used substitute for purchase, with the lessor, in economic reality, taking the place of a financing agency and the lessee paying the equivalent of the full purchase price, plus interest, within the minimum lease period. The lessee, in effect, is the true purchaser. Under present tax laws, which appear to be the basis on which these arrangements are made, it is foreseeable that this method of transferring the right to use goods will encompass a sizeable portion of the volume of commercial transactions which have the use of goods (rather than their consumption) as their immediate economic end. Id.
 
 
 24
 We believe that the complex financial arrangements in this lease simply disguise a form of ownership by Interpool recognizable under the NYV & TL. None of Interpool's arguments persuaded the district court "that Interpool was not, in practical effect, an owner within the meaning of Sec. 128" of the NYV & TL. We agree with that conclusion.
 
 II. The Trial By The Jury
 A. Liability
 
 25
 O'Connor argues that the district court erred in refusing to direct a verdict or to grant a judgment notwithstanding the verdict and set aside the jury's finding that he was 18% responsible for the accident. In ruling on a motion for a directed verdict or for judgment notwithstanding the verdict, the court applies the same test, Noonan v. Midland Capital Corp., 453 F.2d 459, 461 (2d Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972), which is whether there is a complete absence of evidence to support a verdict or "such an overwhelming amount of evidence in favor of the movant that reasonable and fairminded [jurors] could not arrive at a verdict against him." Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 132 (2d Cir.1986).
 
 
 26
 Under New York law, a traffic light signal in favor of a driver does not give him an absolute right of way, and he is "obliged to enter the intersection with care and caution." Zemlock v. Cannon, 202 N.Y.S.2d 956, 959 (N.Y. City Ct.1960). The jury had sufficient evidence to decide that O'Connor did not exercise the required "care and caution" when pulling out into a busy intersection. One witness testified that O'Connor did not look to his left to check for oncoming traffic, and a witness in the car directly behind O'Connor testified that O'Connor failed to take any precautionary action at all. More than one witness testified that O'Connor was engaged in conversation with occupants of the car. The other passenger in the car, Mr. Waldman, testified that it was Matthews who yelled "watch out" just prior to the accident. It is true that the district judge in the non-jury trial found that O'Connor was not negligent. However, she also noted that this was a "factual issue on which reasonable persons may differ," that the credible evidence, in her judgment, was "evenly divided," which required a finding "against the party with the burden of proof," and that her finding "in no way affects the jury's contrary finding" regarding O'Connor's negligence.
 
 
 27
 After a thorough examination of the record, we believe that we cannot overturn the jury verdict regarding O'Connor. While we might have agreed with the judge had we been the trier of fact, we cannot say that there was a complete lack of evidence supporting the verdict or that O'Connor had such an overwhelming amount of evidence in his favor that a fair-minded jury could not find against him.
 
 B. Damages
 1. Future Earnings
 
 28
 The jury found that Matthews, who was 40 years old and a partner at one of the big eight accounting firms when the accident occurred, suffered loss of future earnings of $5,000,000. The jury also specifically found a zero percent discount factor to be applied to this item of damages. O'Connor, Grato, Rodino and Interpool claim that this damage award was excessive and should be set aside. These parties argue principally that the judge should have reduced the future earnings award by two percent because Matthews offered no convincing evidence on an appropriate discount rate, and the court should have told the jury to apply a two percent discount rate to its award. See McCrann v. United States Lines, Inc., 803 F.2d 771, 775 (2d Cir.1986). O'Connor, Grato, Rodino and Interpool argue that a properly discounted award on this element of damages could have been no more than $3,883,150, the amount found by the judge for future lost earnings in the non-jury trial against Spanish Lines.
 
 
 29
 We believe that defendants failed to preserve the "discount rate" issue for appeal. The district judge gave a thorough charge with respect to a discount rate, explaining the principle behind such an instruction and closely following the law of this circuit set out in such cases as McCrann and Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2d Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). There was no objection to this aspect of the court's charge or claim that she should have told the jury to apply a two percent discount rate instead of allowing them to choose another rate. Under the circumstances, there was no reversible error on this issue.
 
 2. Non-Pecuniary Damages
 
 30
 The jury awarded Matthews $7 million in total damages and, as already indicated, assigned $5 million as damages for loss of future earnings. O'Connor, Interpool, Grato and Rodino claim that the remaining sum of $2 million was awarded for non-pecuniary damages and was grossly excessive. We are not sure that these parties are correct in their apparent assumption that the entire $2 million represents non-pecuniary damages because the judge instructed the jury that it could find an award for "earnings lost to date," which could have been substantial.[4]
 
 
 31
 In reviewing a claim of excessive damages, an appellate court must accord substantial deference to the jury's determination of factual issues. Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 750 (2d Cir.1984). A judgment will be upheld unless the damages awarded are so excessive "as to shock the judicial conscience." Id. (quoting United States ex rel. Larkins v. Oswald, 510 F.2d 583, 589 (2d Cir.1975)). In determining whether an award meets that test, we look to other jury awards allowed to stand by the courts of the state whose substantive law governs the rights of the parties--in this case, New York. Id.
 
 
 32
 As a result of the accident, Matthews suffered significant brain damage accompanied by psychological injuries, weakness on the left side of his body and a fractured left arm. The effects of his injuries are likely to plague him for the rest of his life. He has lost the ability to compute simple mathematical equations, to engage regularly in sexual relations, and to enjoy sports in which he once excelled. The accident has also weakened the relationship between Matthews and his family due to his irritability and impatience. Because of the quality of life Matthews enjoyed before the accident, the debilitating nature of his injury, and the destructive effect of the accident on his family relationships, we cannot say that the award of $2 million shocks our conscience, even if we ignore the possibility that damages for past earnings may have constituted a substantial part of that award. Gallo v. Supermarkets Gen. Corp., 112 A.D.2d 345, 491 N.Y.S.2d 796, 798, appeal denied, 66 N.Y.2d 605, 498 N.Y.S.2d 1025, 489 N.E.2d 770 (1985).
 
 
 33
 C. Matthews's Attorney's Conduct in Summation
 
 
 34
 O'Connor claims that the closing argument of Matthews's attorney created such undue prejudice and passion and so aroused the sympathy of the jury as to require reversal and a new trial. In particular, they object to the following: counsel's reference to O'Connor's ability to pay the judgment; remarks concerning defendants and defendants' counsel; inflammatory remarks including a statement that defense experts were "bought and paid for"; and an oblique reference to the amount of damages in contravention of a court admonition not to mention amounts. Although we find the attorney's reference to the amount of damages troublesome, we do not believe that the summation "irreparably taint[ed]" this proceeding. Smith v. National R.R. Passenger Corp., 856 F.2d 467, 470 (2d Cir.1988). Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted. Id. After summations, the district judge invited requests for curative instructions and acted upon the only request received. When defense counsel belatedly raised objections to the summation after the court had charged the jury, the district judge expressly found that the summation was not "so prejudicial as to warrant a mistrial." In light of the fact that defendants offered the district judge no timely opportunity to cure the alleged overzealousness of Matthews's attorney, we do not believe that the district judge abused her discretion in refusing to grant a new trial on the basis of the summation.
 
 D. Negligence of Hubsport and Chaco
 
 35
 As indicated above, all of the defendants impleaded Hubsport and Chaco as third-party defendants, claiming that they were negligent in the maintenance of the shrubbery at the entrance way to the office complex and that this contributed to the accident. O'Connor claims that the jury's verdict holding these third-party defendants not negligent goes against the weight of the credible evidence, and is thus apparently attempting to obtain review of the refusal of the district court to order a new trial on this issue. We doubt whether such review is available under the precedents in this circuit. Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d at 133; Compton v. Luckenbach Overseas Corp., 425 F.2d 1130, 1132-33 & n. 2 (2d Cir.), cert. denied, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970). In any event, the argument is without merit. There was certainly evidence supporting Hubsport and Chaco, and a jury could fairly have found for them. Indeed, in her opinion rendering a nonjury verdict in the claim against Spanish Lines, the district judge found that "a preponderance of the credible evidence does not establish negligence in the design or maintenance of the bushes." It simply cannot be said that the jury verdict was seriously erroneous and represented a miscarriage of justice. Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978).
 
 III. The Trial by the Judge
 A. Liability and Damages
 
 36
 In the bench trial against Spanish Lines, the judge, unlike the jury, did not find O'Connor negligent and partially responsible for the accident. Interpool claims that under the precedents of this circuit, the district court was powerless to make findings of fact or conclusions of law which differed from the jury's findings. Citing Caputo v. United States Lines Co., 311 F.2d 413, 416 (2d Cir.), cert. denied, 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963), Interpool argues that inconsistent verdicts based on the same evidence at the same trial are logically impossible, and the court must, as a matter of law, follow the verdict of the jury. It is true that in Caputo we held that when the principal claim in a case is tried to a jury and the third party plaintiff's claim for indemnity is at the same time tried to the court, pursuant to Fed.R.Civ.P. Rule 14(a), the court is bound by the verdict of the jury. Id. However, Caputo differs substantially from the case at hand.
 
 
 37
 Caputo did not involve the FSIA, which expressly requires that the "action be tried to the court without jury." 28 U.S.C. Sec. 1441(d). This court has recognized that as a matter of statutory construction, Sec. 1441(d) bars jury trial when a foreign state, as it is broadly defined in the FSIA, is sued in state court, and the action is then removed to federal court, as was the case here. Ruggiero v. Compania Peruana De Vapores, 639 F.2d 872, 876 n. 7 (2d Cir.1981). We reached that conclusion, in part, by comparing suits against a foreign sovereign to suits against the United States, in which jury trial is also precluded. Id. at 879-81; see Arango v. Guzman Travel Advisors, 761 F.2d 1527, 1535 n. 8 (11th Cir.1985). Suits against "foreign sovereigns," like suits against the United States, "are sui generis," and while they are allowed by statute in some instances, e.g. under the FSIA and the Federal Tort Claims Act, 28 U.S.C. Secs. 1346(b), 2671 et seq. (1982), the sovereign (foreign or domestic) is not subjected to the "great vicissitudes of jury trial." Ruggiero, 639 F.2d at 881. In a suit against multiple defendants including the United States, a plaintiff may, of course, invoke his right to a jury trial against the other defendants but, under the FTCA, he cannot obtain a jury trial against the United States. See Texasgulf Inc. v. Colt Elecs. Co., 615 F.Supp. 648, 659 (S.D.N.Y.1984); In re Air Crash Disaster at Metro. Airport, Detroit, Mich. on January 19, 1979, 619 F.Supp. 13, 16-17 (E.D.Mich.1984), aff'd mem., 782 F.2d 1041 (6th Cir.1985).
 
 
 38
 The issue in this case is whether the FSIA's insulation of a foreign sovereign from jury fact-finding overrides the rule of Caputo and assures the foreign sovereign the benefit of a court's fact-finding even where such fact-finding differs from the fact-finding of a jury on the same issue in the same trial. We conclude that the FSIA has such effect as to all fact issues that underlie liabilities of the foreign sovereign that arise as a matter of law. As to fact-finding that concerns obligations the foreign sovereign has voluntarily undertaken, we consider that issue below in connection with Interpool's claim for indemnity.
 
 
 39
 We reach this conclusion as to the FSIA because the terms of the statute require it and there is no constitutional or other reason for declining to apply it as written. Neither a plaintiff nor a crossclaiming defendant has an inherent right to sue a foreign sovereign in either the federal or the state courts of this country. When such suit is authorized by federal statute, the terms under which suit is permitted must be respected.
 
 
 40
 Though the issue appears not to have been precisely faced by any court of appeals, at least one district court has reached the same conclusion with respect to the liability of the United States under the Federal Tort Claims Act. In Moloney v. United States, 354 F.Supp. 480 (S.D.N.Y.1972), a jury, hearing a plaintiff's claim against a private defendant, found that the defendant was not negligent and that the plaintiff was not contributorily negligent. Nevertheless, the trial judge, hearing the plaintiff's claim against the United States, found that the plaintiff was contributorily negligent and on that basis exonerated the United States, which the judge had also found to be negligent. Id. at 483. We think the trial judge in Moloney was entitled to disregard the jury's fact-finding in reaching his conclusions concerning the liability of the United States and that the same approach is applicable under the FSIA.[5]
 
 
 41
 Spanish Lines argues that the district court erred in its findings and should be reversed. Spanish Lines apparently does not argue that the district court used the wrong legal standard. Spanish Lines simply claims that the findings of fact, upon which the district court based its legal conclusions, were clearly erroneous. See Mamiye Bros. v. Barber S.S. Lines, Inc., 360 F.2d 774, 776 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 333 (1966). After a careful review of the evidence, we are not "left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). On the record in this case, different triers of fact could come to different conclusions--as, indeed, they did--regarding O'Connor's relative fault. Although there was testimony indicating a lack of care by O'Connor, there was also evidence that would permit a trier of fact to conclude that O'Connor entered the intersection carefully and, upon looking to his left, could do absolutely nothing to avoid the oncoming tractor trailer. Under these circumstances, we cannot say that the district court was clearly erroneous in the findings upon which it concluded that O'Connor was not negligent in the operation of the vehicle.
 
 
 42
 Spanish Lines also objects to the district court's damage award, arguing that the damages as a whole are grossly excessive and that the district court erred in failing to discount that portion of the lump sum award of $300,000 for depression and mental anguish that related to the future and in similarly failing to discount for loss of services. In light of our prior conclusion that the jury's damage award was not grossly excessive, we hold that the judge's lower award does not shock the judicial conscience.
 
 
 43
 In determining whether the district court must discount lump sum awards for future non-pecuniary damages, we must first look to New York law. O'Rourke v. Eastern Airlines, Inc., 730 F.2d 842, 857 n. 24 (2d Cir.1984). Although the New York Court of Appeals has not spoken definitively on this matter, one lower New York state court has stated in dictum that "it is proper to apply present value to prospective damages under appropriate circumstances." Nelson v. State, 105 Misc.2d 107, 431 N.Y.S.2d 955, 961-62 (Ct.Cl.1980). In any case, where a state has no definitive law governing the discounting of future nonpecuniary damages, it is reasonable to infer that the state court, if faced with the issue, would apply a discount factor to the damages. See Metz v. United Technologies Corp., 754 F.2d 63, 67-68 (2d Cir.1985).
 
 
 44
 In discounting for future non-pecuniary damages, all that is required is that the time value of money be "take[n] into account." Oliveri v. Delta S.S. Lines, Inc., 849 F.2d 742, 751 (2d Cir.1988) (quoting Metz, 754 F.2d at 68 n. 3). The district court met this standard with respect to future physical pain and suffering by explicitly stating that it was reducing its award "to present cash value." It is true that the district court neglected to make explicit any discount applied to the amounts awarded for future depression and mental anguish and for loss of services. Although we find this omission troubling, we do not believe that it requires a remand.
 
 
 45
 In the fixing of damages, we must "give the benefit of every doubt to the judgment of the trial judge." Gretchen v. United States, 618 F.2d 177, 181 (2d Cir.1980) (quoting Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir.1961)). Although the district court should have stated clearly that it was reducing every future award to present value, we are willing to assume that it did reduce the damages for future depression and mental anguish and for loss of services to present value without making its calculations explicit. The judge obviously was aware of this circuit's "clear preference for discounting" future non-pecuniary awards to present cash value, see Oliveri, 849 F.2d at 751, because the judge did so explicitly with respect to future physical pain and suffering. In addition, the district court awarded the same amount of damages ($300,000) for depression and mental anguish and for loss of services as were awarded for future physical pain and suffering. Although these facts do not compel the conclusion that the district court reduced the awards on the former to present value, we believe that they support that conclusion. In any case, we cannot say, in light of the reasonableness of the awards in question, that the judge's failure to make explicit a discount percentage rate requires a re-calculation.
 
 B. Exposure to a Jury Verdict
 
 46
 The district court held that under Spanish Lines's contract with Interpool for the lease of the chassis, Interpool is entitled to be indemnified by Spanish Lines for the judgment against Interpool. The district court also held that, based on the jury's finding that O'Connor was negligent, Spanish Lines and O'Connor were joint tortfeasors and that, accordingly, O'Connor had a right to contribution from Spanish Lines up to the amount of the latter's total liability found by the court. Spanish Lines argues that the district court erred in both rulings because the FSIA protects it from this kind of exposure to a jury verdict.
 
 1. Indemnification
 
 47
 As indicated above, Interpool leased the chassis to Spanish Lines. In the lease agreement, the lessee (Spanish Lines) promised to "indemnify and hold Lessor [Interpool] harmless from all liability, damage or loss ... arising out of ... (b) any claim, whether private or governmental, for personal injury...." (emphasis added). In determining the amount that Spanish Lines had to indemnify Interpool, the district court looked to the jury verdict because it fixed Interpool's total liability arising out of Matthews's claim for personal injury. Since Spanish Lines had agreed to indemnify Interpool for its total liability, the district court properly used the jury verdict to ascertain that amount.
 
 
 48
 The FSIA protects Spanish Lines against obligations arising by virtue of our domestic law, but it need not insulate it from liabilities it voluntarily assumes. For example, if the indemnity clause of the lease had explicitly obligated Spanish Lines to pay Interpool for any losses "in whatever amount may be determined by a jury," we have no doubt that Spanish Lines would have to indemnify Interpool for the amount of the jury verdict. The indemnity clause here is not that specific, but we think it is fair to construe it as if it were.
 
 
 49
 We are troubled by this outcome because the FSIA would surely guarantee Spanish Lines a non-jury trial as to the amount of damages it owes for its own action in breaching a contract.[6] But by indemnifying a third party, we believe Spanish Lines has given up its FSIA protection and agreed to pay any losses incurred by its indemnitee (arising out of the leasing of equipment), including losses determined by a jury. It can be said that the choice is between reading the FSIA not to cover indemnitees or obliging all indemnitees to put into their contracts with entities owned by foreign governments explicit language covering jury awards. We favor the former course. We therefore affirm the district court's conclusion that Spanish Lines has to abide by its agreement and indemnify Interpool for Interpool's liability.
 
 2. Contribution
 
 50
 Under New York law, two persons who are subject to liability for damages for the same personal injury may claim contribution from the others. Schauer v. Joyce, 54 N.Y.2d 1, 5, 444 N.Y.S.2d 564, 429 N.E.2d 83 (1981). The district court held that since both Spanish Lines and O'Connor were found liable for the same injuries, O'Connor could obtain contribution from Spanish Lines as a joint tortfeasor in an amount not to exceed Spanish Lines's total liability, as found by the court.
 
 
 51
 In this context Spanish Lines's FSIA argument is more substantial, and, in our view, correct. The FSIA assures Spanish Lines that all liabilities that might be imposed upon it by operation of law are to be determined by a court, not a jury. In the non-jury tort trial, the judge exonerated O'Connor of all liability. Therefore, as far as Spanish Lines is concerned, he is not a joint tortfeasor, and he does not become one just because a jury said he was in the jury trial.
 
 
 52
 It should not matter that Spanish Lines would still pay less than the district judge's bench verdict awarded against it, even if it makes contribution to O'Connor. Spanish Lines is entitled to all the benefits of a non-jury trial, i.e., not only a cap on its maximum direct exposure as a defendant, but an opportunity to limit its payout by virtue of whatever contribution consequences arise from the bench trial. If Matthews collects from O'Connor, O'Connor can obtain contribution only from tortfeasors other than Spanish Lines because, by virtue of the FSIA and the district court's verdict in the bench trial, O'Connor is not a joint tortfeasor as regards Spanish Lines.
 
 
 53
 From O'Connor's perspective, this undoubtedly seems quite unfair. By "winning" in the bench trial, he loses the right to contribution from Spanish Lines. But he was not at risk in the bench trial at all. That trial determined the fate of Spanish Lines. It is simply O'Connor's misfortune that the party from whom he would have received contribution if all liabilities had been determined by a jury has the benefit of FSIA insulation from jury determinations.
 
 
 54
 The parties have made several other claims by error by the district court. We have considered all of these arguments and find them to be without merit.
 
 Conclusion
 
 55
 For all of the above reasons, we affirm the judgment of the district court, except for the modification regarding O'Connor's right to obtain contribution from Spanish Lines.
 
 
 
 [1]
 The spelling of third-party defendants is that reflected in the official caption of the case. The spelling in the briefs varies from time to time
 
 
 [2]
 For convenience, we will usually refer to Matthews in the singular, even though the argument under discussion may be, in context, made by Thomas Matthews, Kathleen Matthews, or both jointly
 
 
 [3]
 For convenience, we will usually refer to O'Connor in the singular, even though the argument under discussion may be, in context, made by Barbara O'Connor, Dennis O'Connor, or both jointly
 
 
 [4]
 In the separate findings of fact in the bench trial against Spanish Lines, the judge originally found that Matthews had lost earnings to date of $460,000. However, the judge eliminated this item of damages in her amended findings of fact, issued shortly thereafter, apparently because defendants persuaded her, as the trier of fact, that the evidence on this issue was "unclear." It would seem, however, that her resolution of this issue would not prevent another trier of fact from including an award for lost earnings to date, especially when instructed that it could do so
 
 
 [5]
 See also Georges v. Hennessey, 545 F.Supp. 1264 (E.D.N.Y.1982), and In re Air Crash Disaster at Metro. Airport, Detroit, Mich. on January 19, 1979, 619 F.Supp. 13 (E.D.Mich.1984), aff'd mem., 782 F.2d 1041 (6th Cir.1985), which are arguably relevant
 
 
 [6]
 If the fact of an indemnity obligation were in dispute, Spanish Lines would also be entitled to have the district court perform the fact-finding on that issue