**NATIONAL EQUIPMENT RENTAL, LTD., Plaintiff,**

v.

**PRIORITY ELECTRONICS CORP., George M. Von Burger, Regina Von Burger, Hans Rossen, Margaret Ann Rossen, George N. Haddad and Lois Y. Haddad, Defendants.**

No. 75C 612.

United States District Court,
E. D. New York.

July 29, 1977.

Gerald S. Jacobs, Lake Success, N.Y., for plaintiff.

Cullen & Dykman, Garden City, N.Y., for defendants.

PLATT, District Judge.

The plaintiff, National Equipment Rental ("NER"), moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment against the defendants, George Haddad and Lois Haddad. Those defendants cross move for summary judgment against the plaintiff. This case was brought in this Court under diversity jurisdiction.

## FACTS

On April 4, 1973, the plaintiff NER entered into an agreement ("Agreement A") with Priority Electronics Corp. ("Priority") concerning the use by Priority of certain computer equipment. On November 16, 1973, NER entered into a second agreement ("Agreement B") with Priority involving more computer equipment. On March 26, 1973, prior to signing these agreements, NER had obtained written guarantees of payment of these agreements from several guarantors, including the defendants Mr. and Mrs. Haddad.

Agreement A provided that Priority was to pay $933.82 a month for the first sixty months plus $2,122.31 per month for the next two years for a total payment of $60,273.82. Added to this agreement was an option contract that gave Priority the option to purchase the equipment at the end of the seven years for $1,697.85 "plus applicable taxes or fair market value, whichever is greater."

The cost to NER of the equipment covered by Agreement A was $40,425. This equipment was purchased by NER after Agreement A was signed, and the agreement specified under the heading "Description of Leased Equipment (Include Name and Address of Vendor)" that the vendor was to be Teredyne, Inc.

Agreement B provided for payments of $1,249.96 per month for the first sixty months plus $2,840.82 per month for the next two years for a total payment of $80,679.82. The added option contract had the same terms as Agreement A, but the purchase price was $2,164.43 "plus applicable taxes or fair market value, whichever is greater." The cost to NER of the equipment covered by Agreement B was $54,110.86.

In both agreements there was an "acceleration clause" providing that if Priority defaulted in its payments, the full balance became due and owing.

On April 23, 1973, NER filed financing statements covering the equipment in both agreements. Further, NER published notice of intention to create a security interest for the equipment covered by Agreement B.

On October 20, 1974, Priority defaulted on both agreements leaving an unpaid balance of $44,398.88 on Agreement A and an unpaid balance of $65,679.72 on Agreement B.

NER then hired Leasing Services, Inc. ("Leasing") to repossess the computer equipment from Priority. On January 30, 1975, Leasing repossessed the equipment and stored it in its warehouse. In the spring of 1975 NER inventoried the repossessed equipment at the Leasing warehouse, and found that Leasing had, without authority, sold most of the NER equipment. In effect, Leasing illegally converted the equipment owned by NER.

## DISCUSSION

It is the plaintiff's position that the agreements in this case were true leases and so on Priority's default the unpaid balances were now due and owning.

It is the defendants' position that these agreements were leases intended as security for the payment of the purchase price and so the transactions are governed by Article 9 of the Uniform Commercial Code. Further the defendants argue that the plaintiff's action was a retention of the goods in satisfaction of Priority's obligation under § 9–505.

In response, the plaintiff argues that if these agreements are governed by Article 9, then the conversion of the computer equipment by its agent Leasing after Leasing had repossessed it from Priority was a commercially reasonable sale under § 9–504 and so under § 9–504(2) the debtor is liable for the deficiency between the "resale price" and the value of the equipment. Alternatively, the plaintiff argues that even if the disposition of the equipment does not meet the requirements of § 9–504, the plaintiff is still entitled to the difference between the fair market value of the equipment at the date of repossession and the outstanding debt.

## I

The first issue then is whether the agreements in this case were leases or leases intended as security. Section 1–201(37) of the Uniform Commercial Code (McKinney's 1964) states in relevant part as follows:

"Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

While this section says that the effect of each lease should be determined by the facts of each case, it does make the exception that if there is a purchase option for "nominal consideration" then the lease is one intended for security.

■ One test used by the courts in determining whether a lease is one intended for security is to compare the purchase option price to the total rentals. Thus in *In re Crown Cartridge Corp.,* 220 F.Supp. 914 (S.D.N.Y.1962), a purchase option of 7.7% was held to make the lease one intended for security. In *In re Herold Radio & Electronic Corp.,* 218 F.Supp. 284 (S.D.N.Y.1963), aff'd, 327 F.2d 564 (2d Cir. 1964), the same result was reached with a 10% purchase option. See *In re Merkel, Inc.,* 45 Misc.2d 753, 258 N.Y.S.2d 118 (Sup.Ct. Queens Co. 1965) (8.5% held nominal), rev'd on another ground, 25 A.D.2d 764, 269 N.Y.S.2d 190 (2d Dept. 1966); *In re Alpha Creamery Co., Inc.,* 4 U.C.C.Rep. 794 (W.D.Mich.1967) (less than 25% held nominal).

■ In a similar case in the Southern District the Court held that a 9 % purchase option was nominal within the meaning of § 1–201(37). *In re Oak Mfg., Inc.,* 6 U.C.C. Rep. 1273 (S.D.N.Y.1969).

The purchase options in this case were for $1,697.85 under Agreement A and $2,164.43 under Agreement B. Both of these figures represent approximately 2.7% of the total rental value or 4% of the purchase price of the equipment. These figures would strongly indicate that the purchase options here were for nominal consideration and thus the leases were intended as security.

Furthermore, the Court in *Leasing Service Corp. v. American Nat. Bank & Trust Co.*, 19 U.C.C.Rep. 252 (D.N.J.1976) held that even though there was no purchase option the lease could create a security interest. Among other criteria, the Court relied on the fact that the total rental payments exceeded the value of the equipment by 37% indicating that the leases were really conditional sales, and thus the leases were intended as security.

A similar result was reached in *O.P.M. Leasing Services Inc. v. Homestead Fabrics, Inc.*, 18 U.C.C.Rep. 1342 (Sup.Ct. N.Y.Co. 1976), where the Court held that the transaction created a security interest relying on, among other things, the fact that the total rentals approximated the cost of the equipment plus interest.

In this case, the total rentals exceed the purchase price by approximately 46% under Agreement A and 30% under Agreement B. These figures would indicate that these leases were intended as security.

In response to the above, the plaintiff argues that the purchase options are worded in the alternative. Both options do provide for a set dollar value "or the fair market value, whichever is greater." The plaintiff does not argue that this would have increased the purchase option price. In fact at page 8 of its Memorandum of Law it quotes from the deposition of one of its salesmen in support of the argument that the fair market value of both sets of equipment would be *below* the purchase option price at the end of the seven year period. Rather it is the plaintiff's position that since the purchase option price must be equal to or greater than the fair market value, therefore the consideration cannot be considered nominal under the Uniform Commercial Code.

We do not find this argument persuasive as the Code talks in terms of "nominal consideration" regardless of whether the consideration represents the fair market value or not. Further, the main case cited in support of this position is *In re Oak Mfg. Inc., supra*, where as we have noted, the Court found a 9% purchase option to be nominal. In that case the Court did discuss a fair market value test, but only as a part of a series of tests, including the ones we have discussed above. The Court also compared the purchase option price to the total rentals and compared the total rentals to the selling price and concluded that under all three tests, the lease was intended as a security under Code. In our case, two of those three tests would indicate the leases were intended as security, and only the fair market value test would indicate the leases were true leases.

■ Moreover, in a case such as this one where the equipment will be essentially worthless at the end of the lease period, if a fair market value test was used, the parties could determine whether the agreement would be a lease or a sale by the simple expedient of including or excluding a "fair market value" option purchase price such as the one in this case. In other words, the plaintiff would have us hold that even if the fair market value of the equipment at the end of the lease is one dollar and that is the option price, then one dollar is not "nominal consideration" under the Code.

Therefore, under all the facts of this case we hold that these agreements were leases intended as security.

## II

■ Since we have found that the agreements here were leases intended as security, then Article 9 of the U.C.C. is applicable as § 9–102(2) (McKinney's 1964) states that this "Article applies to security interests created by contract including . . . lease or consignment intended as security."

Under Article 9 the secured party has two relevant options after repossessing goods of a defaulting debtor. Under § 9–505 the secured party can retain the collateral in satisfaction of the debtor's obligation, or, alternatively, under § 9–504 the secured party can sell the repossessed goods, apply the sale price to the indebtedness, and look to the debtor for any deficiency. However, § 9–504(3) requires that any sale under that section be "commercially reasonable."

The Court cannot understand how the circumstances of this case could possibly support a finding that there was a commercially reasonable sale as required by § 9–504. After repossession, the equipment was not sold at all. It was, in effect, converted by the plaintiff's agent. While the Court agrees that this deprived the plaintiff of an opportunity to dispose of the property in a commercially reasonable manner, we cannot hold that this activity was a commercially reasonable sale. (See discussion *infra* concluding that there was in fact no sale here at all much less one that might be said to be a "commercially reasonable" one.)

### III

The plaintiff's final argument is that even if its disposition of equipment after repossession did not meet the requirements of § 9–504, the plaintiff is still entitled to any deficiency if it can prove that the fair market value of the equipment was less than unpaid balance.

The defendants argue that we should not even reach this question as the plaintiff has not sold the goods at all as required by § 9–504, and so the plaintiff must have retained the goods in satisfaction of its obligation under § 9–505. Under this reasoning the defendants would owe the plaintiff nothing.

We agree with the defendants. Section 9–504 contemplates a sale, either reasonable or unreasonable. There was no sale here. Section 9–505 covers retention of the repossessed goods. The goods were retained by this plaintiff, even if involuntarily. The plaintiff might well have been able to sell the goods if its agent had not converted them, but between the plaintiff and the defendants, the responsibility for the failure to sell the goods must fall on the plaintiff who hired the wrongdoing agent. Therefore, we hold that the plaintiff's actions here were a retention of the repossessed equipment in satisfaction of Priority's obligation under § 9–505.

The defendants' motion for summary judgment should be, and the same hereby is, granted.

SO ORDERED.