In re BEKER INDUSTRIES CORP., et al., Debtors.

NYNEX BISC (formerly known as NYNEX Information Systems, Company), Plaintiff,

v.

BEKER INDUSTRIES CORP., as debtor in possession, Defendant.

Bankruptcy No. 85–B–11709–10.
Adv. No. 86–5458A.

United States Bankruptcy Court, S.D. New York.

Feb. 11, 1987.

See also, Bkrtcy., 64 B.R. 900.

Kronish, Lieb, Weiner & Hellman, New York City by William J. Rochelle, III, for debtors.

Michael Cook, New York City, for NYNEX BISC.

## DECISION AND ORDER

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

■ Plaintiff, NYNEX Business Information Systems Company ("NYNEX"), seeks, in this adversary proceeding against the defendant debtor and debtor-in-possession, Beker Industries Corp., Inc. ("Beker" or the "Debtor"), to recover damages and immediate possession of telephone equipment which is the subject of an agreement between the plaintiff and the Debtor.[1] Plaintiff contends that the agreement is a true lease and therefore it is entitled to immediate possession or a judgment in the amount of rental payments due from the time of the Debtor's default, together with interest thereon, and requiring the Debtor to assume or reject the lease, cure prior defaults and provide adequate assurance of future performance. *See* 11 U.S.C. § 365(a), (b) (1984) (the "Code"). The Debtor claims that in substance and effect, the agreement is the functional equivalent of a sale coupled with a security agreement, pursuant to which plaintiff only retains a purported security interest in the equipment to secure Beker's obligations. It, therefore, asserts that the transaction is governed by Article 9 of the Uniform Commercial Code ("U.C.C."), as adopted in the State of Connecticut, Conn.Gen.Stat. §§ 42a–9–101 *et seq.*

It is undisputed that NYNEX did not file a U.C.C. financing statement to perfect its interest as would be required by U.C.C. § 9–302. Accordingly, if the transaction is found to have been a sale, the rights of NYNEX are "subordinate to the rights of ... a person who becomes a lien creditor before the security interest is perfected...." U.C.C. § 9–301(1)(b). Beker succeeded to such status upon filing its reorganization petition. *See* 11 U.S.C. §§ 544(a), 1107(a). It would consequently be entitled to avoid the security interest under 11 U.S.C. § 544 and § 550(a), if the transaction is deemed a sale rather than a lease, thereby leaving NYNEX with an unsecured claim for the amounts owed.

The principal issue to be decided in this case is whether there is a true lease or a lease intended as a security agreement. Trial was held on November 20, 1986 and post-trial briefs were submitted on December 19, 1986.

## I.

The Debtor filed a voluntary petition for relief under Chapter 11 of the Code on October 21, 1985. This Court's jurisdiction is based on 28 U.S.C. § 157 and § 1334.

---

1. Section 362(a)(3) of the Code's automatic stay provision, 11 U.S.C. § 362(a)(3), bars acts to obtain ownership, possession or control of property of the estate. As a defense, the Debtor asserts that plaintiff has failed to seek relief from the stay, with respect to its request for immediate possession of the equipment. Therefore, that remedy may not be granted. Plaintiff, however, need not request relief from the stay here to pursue its request for post-petition rental payments.

Venue is based on the filing of a Chapter 11 petition by defendant, Beker, in the Southern District of New York.

Sometime in March of 1984, Barry Adams, an accounting manager for NYNEX, spoke with a Mrs. McGoldrick of Beker Industries "to review [Beker's] communication needs" (Tr. at 7). Adams subsequently met with McGoldrick and a Mr. Dennerly to discuss replacement of their old Centrex Telephone System (Tr. at 28). The Beker representatives were offered three various arrangements: (i) an outright sale of the equipment, (ii) a lease with a one dollar buy-out option at the end of the term, and (iii) a lease with a fair market value buy-out option (Tr. at 9). The lease with the fair market value buy-out was selected (*id.* at 9–10). Pursuant to this selection an agreement, entitled the "Equipment Lease", was finalized on January 4, 1985 (the "Agreement").

On the face of the Agreement, NYNEX was to lease and Beker was to rent a certain telephone system comprised of three basic components: basic common equipment (commonly known as a switch), terminal equipment (better known as a receiver), and wiring (Tr. at 19–20). The payment terms consisted of a one-time administration fee of $6,457.80 plus monthly payments in the amount of $3,254.73, including sales tax of $244.10, for a period of forty-eight (48) months (Pl.Exh. 1). The system was installed and became operational in July of 1985 (Tr. at 35). Beker forwarded one payment on August 15, 1985, in the amount of $9,956.63, and has since been in default.

As a result of Beker's failure to meet its contractual obligations, NYNEX filed its complaint on May 5, 1986 seeking to enforce the default provisions of the Agreement, including its rights to repossession of the telephone equipment and money damages for unpaid rental fees.

**2.** Connecticut Law adopts the text of U.C.C. § 2–101(37) verbatim. *See* Conn.Gen.Stat.

## II.

The basic guideline for determining whether a lease is a security agreement is set forth in U.C.C. § 1–201(37).[2] That section provides, in pertinent part:

whether a lease is intended as security is to be *determined by the facts of each case;* however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the *option to become the owner* of the property for no additional consideration or *for a nominal consideration does make the lease one intended for security.*

U.C.C. § 1–201(37) (emphasis added). Thus,

in determining when the lease *is* intended as security, consideration should be given to (a) the intention of the parties, (b) the consideration connected with the exercise of the purchase option, (c) "the percentage that option purchase price bears to list price, especially if it is less than 25%," (d) whether the terms of the lease and option are such that "the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods."

T. Quinn, *Uniform Commercial Code Commentary and Law Digest* ¶ 9–102[A][4][b], at 9–8 (1978) (quoting *In re Alpha Creamery Co., Inc.,* 4 U.C.C. Rep. 794 (W.D.Mich.1967)).

As to the intent of the parties at the time of contracting, an objective standard is employed. *Michigan Carbonic Co. v. Anton's Lounge & Restaurant (In re Anton's Lounge & Restaurant),* 40 B.R. 134 (Bankr.E.D.Mich.1984). "The parties' subjective intent 'would not make a true lease of what economic realities might show to be a secured installment sale. To paraphrase Shakespeare's words, a secured transaction by any other name is still a secured transaction, and section 1–201(37)

§ 42a–1–201.

so recognizes.'" 40 B.R. at 136 (quoting *Steele v. Gebetsberger (In re Fashion Optical Ltd.)*, 653 F.2d 1385, 1390 (10th Cir. 1981)).

Here, the undisputed testimony of Mr. Adams reveals that Beker rejected an outright sale and opted for an arrangement styled as a lease (Tr. at 9–10). This would tend to show that the parties intended a lease. On the other hand, Beker rejected the one dollar buy-out lease arrangement and chose the fair market value buy-out. On its surface, this election would also indicate that a lease was intended. But no evidence of the difference in the payment terms of the two leases was submitted. Had the dollar buy-out arrangement consisted of the same rental payments as the fair market value buy-out, one might infer that, in effect, the options were one and the same and that Beker chose the fair market value buy-out in the hope that the nature of the transaction would not be easily deciphered. *See Liona Corporation, N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 200 (2d Cir.1986). Thus, the testimony as to the paper form of the transaction alone is an insufficient base upon which to determine whether the parties' objective intent was to enter into a lease or a sale.

Where such ambiguity exists, courts have considered an array of factors and tests to determine the objective intent or the economic reality of the situation. *See In re Anton's Lounge*, 40 B.R. at 136. Section 1–201(37) states that where the option price to become an owner is nominal, the "lease" is deemed a secured transaction as a matter of law. *Steele v. Gebetsberger (In re Fashion Optical)*, 653 F.2d 1385, 1388 (10th Cir.1981). Four tests have been developed to determine whether an agreement is a true lease under the U.C.C.

The first test involves comparing the option price (purchase price) to the fair market value.

If the purchase price bears a resemblance to the fair market price of the property, then the rental payments were in fact designated to be in compensation for the use of the property and the option is a real one. On the other hand, where the price of the option to purchase is substantially less than the fair market value of the leased property, the lease will be construed as a mere cover for an agreement of conditional sale.

*In re Oak Manufacturing, Inc.*, 6 U.C.C. Rep. 1273, 1276 (S.D.N.Y.1969) (citations omitted). The second test compares the option price to the total rental payments. "Where the option price is disproportionately small in comparison with the total rental, it has been held that the contra[c]t constitutes a conditional sale." *Id.* The percentages applied by the courts have varied from 25% to 10%. *See, e.g., Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882, 885 (W.D.Okla. 1973), *aff'd*, 532 F.2d 166 (10th Cir.1976) (less than 25% is nominal); *Chandler Leasing Corp. v. Samoset Associates (In re Samoset Associates)*, 24 U.C.C.Rep. 510, 513 (Bankr.D.Me.1978) (10%); *National Equipment Rental v. Priority Electronics Corp.*, 435 F.Supp. 236, 238–39 (E.D.N.Y. 1977) (4%). The third test involves a comparison of the rental payments to the selling price. Where the rental payments are equal to or greater than the selling price, the agreement has been held to be a conditional sales contract. *In re Oak Manufacturing*, 6 U.C.C.Rep. at 1277. The fourth test analyzes additional implications arising from the terms of the agreement itself. *In re Tucker*, 34 B.R. 257, 261 (Bankr.W.D. Okla.1983).

As to the first two tests, the Agreement provides that the option to buy is to be determined by the fair market value at the end of the lease term. In this regard, it is often said that fair market value is "the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 557, 93 S.Ct. 1713, 1719, 36 L.Ed.2d 528 (1973) (quoting Treas.Reg. § 20–2013–1(b)); *accord Kirby Forest Industries, Inc. v. Unit-*

*ed States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984). But, in the imprecise world of equipment "lease" arrangements, fair market value is apparently viewed as "a term that was created to allow people to almost enter into a conditional purchase but, yet, for reasons, for tax purposes, not have to state a value" (Tr. at 139). "The fair market value for the vendor is open-ended" (Tr. at 140). "That's the great mystery of [the] industry" (*Ibid.*). Fair market value is often left to be determined as a result of business negotiations between the putative lessor and putative lessee (Tr. at 148).

Where, as here, fair market value has not been determined through the negotiation process, courts are left with the unenviable task of making that determination. Such a determination can only be made, however, if ample evidence of that value is adduced. Here, neither party presented such evidence indicating what the fair market value would be at the end of the "lease" term. All that was introduced as to the nominalness of the option price, to be determined by fair market value, was the testimony that while the system installed at the Beker premises is worth a lot of money to Beker (Tr. at 125) and has a "pretty good switch" (Tr. at 135), eight out of ten institutions could not resell their used equipment and either threw them out or donated them to charity (Tr. at 150–51). In one instance, a lessee sold its equipment to a purchaser who moved into its old office space but it only received "five percent of the value of the initial cost of the system" (Tr. at 151). A NYNEX representative admitted that NYNEX would not sell used equipment to a new customer (Tr. at 41–42), but might enhance existing stations if that were what the customer requested. The switch, therefore, would have the most value to Beker (Tr. at 108), less value to NYNEX, and the least value to a used equipment dealer (Tr. at 108–09).

The concept of fair market value, however, "presupposes the existence of a broad market with frequent trading in articles of an identical character...." *McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176, 183,

159 N.E. 902, 904 (1928). The evidence, if anything, indicates that a narrow market exists for this type of used telephone equipment. Moreover, it appears that this type of equipment is rarely traded. The existence of a fair market value has, thus, not been established. The value of the system to Beker in its installed condition does not parallel the consideration that would be paid by a willing buyer, who is under no compulsion to buy, to a willing seller. The value to Beker at the end of the lease term would be based on subjective concerns arising from having the equipment in place and not having to subject itself to the inconvenience of a new installation. It is in this light of not being able to determine any fair market value for this equipment that we turn to the first two tests which contemplate comparisons to fair market value.

The first test contemplates a comparison between the option price and fair market value. Here, the option price is defined as fair market value. This, nevertheless, is insufficient to establish that the Agreement is actually a true lease. As the fair market value, and accordingly the option price, approaches nominalness, it is to be given less weight as an indication that the parties intended a true lease. *See National Equipment Rental v. Priority Electronics Corp.*, 435 F.Supp. 236, 239 (E.D.N.Y.1977). The lower the fair market value, the more likely that the parties are looking to the stream of "rental payments" as the principal form of compensation. *See id.* Thus, where the fair market value constitutes nominal consideration, a lease agreement will be deemed a lease intended as security. *See id.* Here, being unable to determine the fair market value of the equipment, we are unable to determine whether that value constitutes "nominal consideration" under the Code. Therefore, this first test provides us with little guidance in the present case.

The second test requires a comparison of the option price to total rental payments. Given the lack of clarity as to the option price, we are unable to make such a comparison here.

Application of the third test, however, indicates that a security agreement was intended. The rental payments for the term of the lease total $162,684.84 before taxes. The total price of the equipment is $129,156.00, also before taxes (Pl.Exh. 1). As a result, gross rental payments over the course of the lease exceed the retail price of the equipment and installation by $33,528.84 or 26%. Courts have consistently found a conditional sale where the rental costs exceed the purchase price. *Leasing Service Corp. v. American National Bank & Trust Co.*, 19 U.C.C. Rep. 252 (D.N.J. 1976) (total rental payments exceeding value of equipment by 37% indicated that leases were really conditional sales); *O.P.M. Leasing Services, Inc. v. Homestead Fabrics, Inc.*, 18 U.C.C. Rep. 1342 (Sup.Ct.N.Y. County 1976) (among other things, that total rentals approximated cost of equipment plus interest created a security interest). That the rental payments would exceed the price by 26%, although not automatically eliminating the possibility of a true lease, *Fashion Optical*, 653 F.2d at 1390, strongly indicates that no residual proprietary rights were contemplated by the lessor at the end of the lease term and thus that the Agreement is to be viewed as a sale secured by a security interest in the equipment.

■ As to the fourth test, factors which indicate that an agreement is intended for security include the following:

(a) whether the lessee is required to insure the items on behalf of the lessor in an amount equal to the total rental payments,

(b) if risk of loss or damage is on the lessee,

(c) if lessee is to pay for taxes, repairs, damage and maintenance,

(d) whether there exist default provisions governing acceleration and resale of the item,

(e) whether there exists a substantial non-refundable deposit requirement,

(f) when goods are to be selected from a third party by the lessee,

(g) rental payments are a reasonable equivalent of the cost of the items plus interest,

(h) the lease is to be discounted with a bank, and

(i) warranties generally found in a lease are excluded by the agreement.

*In re Tucker*, 34 B.R. at 261.

■ The Agreement here in issue contains a number of these provisions. Beker is required to insure the goods in favor of NYNEX for a value equal to the total rental payments, to bear full risk of loss or damage, to pay for taxes, repairs and maintenance, and to indemnify and hold harmless NYNEX from and against any damages, losses, liens or liabilities arising out of the Agreement.

The Agreement also contains a provision in paragraph 21 that in the event of Beker's default, NYNEX shall have the right to

> recover from Lessee ... with or without repossessing the Equipment the sum of (1) all rent and other amounts due ...; and (2) the reversionary value of the Equipment at the end of the Initial Term which it is agreed shall be 10% of the total rent ..., provided, however, that upon repossession or surrender of the Equipment, Lessor shall sell, lease or otherwise dispose of the Equipment in a commercially reasonable manner ... and apply the net proceeds thereof ... to the sum of (1) and (2) above....

(Pl.Exh. 1). This provision appears to grant an equity interest in the Agreement to Beker. NYNEX is permitted to "purchase" the property from the lessee by deducting from the purchase price any amounts the lessee still owes on the "lease". If this were a true lease, one would think that the lessor should be permitted to receive the full amount due from the lessee regardless of any disposition of the equipment subsequent to the termination of the lease. Equity in the lessee is one of the distinctive characteristics of a lease intended for security. *Bill Swad Leasing Company v. Stikes (In re Tillery)*, 571 F.2d 1361, 1365 (5th Cir.1978).

As stated by Judge Hiller in *In re Royer's Bakery, Inc.*, 1 U.C.C. Rep. 342, 345–46 (E.D.Pa.1963):

> whenever it can be found that a lease agreement concerning personal property contains provisions the effect of which are to create in the lessee an equity or pecuniary interest in the leased property the parties are deemed as a matter of law to have intended the lease as security within the meaning of Sections 9–102 and 1–201(37) of the Uniform Commercial Code.

*Accord Equilease Corporation v. AAA Machine Company, Inc. (In re AAA Company, Inc.)*, 30 B.R. 323, 325 (Bankr.S.D. Fla.1983); *Yankee Leasing Co. v. Mountain Carpet, Inc. (In re Mountain Carpet, Inc.)*, 11 B.R. 729, 731 (Bankr.D.Vt.1979); *International Paper Credit Corporation v. Columbia Wax Products Co., Inc.*, 102 Misc.2d 738, 743–44, 424 N.Y.S.2d 827, *rev'd on other grounds*, 79 A.D.2d 700, 434 N.Y.S.2d 270 (1980).[3]

Additionally, where the term of the lease approximates the "useful life" of the machinery, a conditional sale is probably intended. *In re Marhoefer Packing Company, Inc.*, 674 F.2d 1139, 1145, 33 U.C.C. Rep. 370, 381 (7th Cir.1982). Such is to be determined as it exists upon purchase, without any appurtenances that may be added to make it useful in the production of income in the future. A NYNEX representative testified that the Omni S–III or the "Switch" for the system has a useful life beyond 20 years (Tr. at 22) and could be brought up to capacity with other newer equipment because GTE (the maker of the Omni S–III) manages its product line by enhancing its existing products (Tr. at 21). He added that the single-line type telephone set at the Beker premises "could be used on any type of switch in use today and, probably, well into the future" (Tr. at 23). It was stated that these phones could, through dialing an access code, utilize many of the "fancy features" that are available in modern computerized switching equipment (Tr. at 39) and work "just as well" as the "fancier phones" (Tr. at 40). NYNEX's reliance on this testimony is based on a confusion between "useful life" and "functional life". If updated, the life of the system could be extended, but *as is*, the "useful life" of the system is approximately 4½ years (Tr. at 150).[4] This is the approximate term of the lease. Where the lessor expects to receive no residuary interest at the end of the lease term, a security interest in the property must have been intended. *In re Tillery*, 571 F.2d at 1365.

On balance, after applying these tests, the terms of the Agreement, the testimony adduced at trial, and the other evidence present indicate that the Agreement is to be treated as a sale and security agreement. NYNEX, in effect, sold the equipment to Beker through a financing arrangement and held a security interest in the property in case of default.

In this weighing of all the factors, we do not disregard the evidence that of the three contracts considered, the one expressly providing for a sale was not chosen. But the Agreement, nevertheless, contained the significant indicia of ownership noted above which has been held in cases to lead to the finding reached here. Yet they chose to disguise their true intent for whatever reasons they might have had, possibly to receive certain tax advantages, as in *In re PCH Associates*, 804 F.2d at 200. In the aggregate, those indicia point persuasively to a lease disguised as a security agreement. While we cannot say, due to the inconclusive testimony, that the option

---

**3.** NYNEX additionally argues that since it must dispose of the equipment in a commercially reasonable way and not by bulk sale that the document must be viewed as a lease. But those restraints on NYNEX are inconsistent with a true lease where the lessor would presumably have the ability to dispose of its property as it sees fit. The only way NYNEX's assertion can be viewed to have any merit is if the provision was designed to provide for mitigation of damages.

**4.** Mr. Balen testified that this statistic was compiled by AT & T with respect to their equipment and that the Omni S–3 System is comparable to some of the AT & T products evaluated in compiling such statistics.

price, defined as fair market value at the end of the lease term, was nominal, we cannot say to the contrary. In any event, nominalness of option price is not mandatory for a lease to be considered a sale. *In re Fashion Optical*, 653 F.2d at 1389.

The foregoing constitutes this Court's findings of fact and conclusions of law. Judgment is to be entered dismissing the complaint in accordance with the conclusion reached herein. It is

SO ORDERED.