**In re Roger Leon KEMPKER & Joyce Ann Kempker, Debtors.**

**Jack E. BROWN, Trustee, Plaintiff,**

**v.**

**Roger Leon KEMPKER & Joyce Ann Kempker, Bertha Angerer & Lawrence H. Kempker, Defendants.**

**Bankruptcy No. 88–03720–C.
Adv. No. 89–2010–C.**

United States Bankruptcy Court,
W.D. Missouri, C.D.

July 31, 1989.

Duane E. Schreimann, Gerald E. Roark, Jefferson City, Mo., for plaintiff.

Jerry W. Venters, Jefferson City, Mo., for defendants.

Jack E. Brown, Columbia, Mo., trustee.

## MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

### FACTS

This adversary proceeding is brought by the bankruptcy Trustee under 11 U.S.C. § 544 to have all accrued and unpaid interest on a certain promissory note declared waived by its payee and to cancel a third party's alleged interest in personal property. The defendants in this matter are Debtors Roger Kempker and Joyce Kempker, Bertha Angerer, and Lawrence Kempker. Debtors, husband and wife, filed for joint relief under Chapter 7 of the Bankruptcy Code on August 25, 1988. On or about December 27, 1977, Debtors executed an installment note as co-makers, naming Mrs. Angerer, Joyce Kempker's mother, as payee. The Note embraces a principal amount of $35,000.00 and bears interest at 6% per annum. The Note calls for annual payments of $1,750.00 from which the prescribed interest is to be deducted and the balance applied to principal reduction. The Note further provides that its holder may, by written acquiescence, extend the due date for any of the annual principal or interest payments. Such extensions are not to constitute a waiver or forfeiture of any payments, and any such extended payment is due and payable upon the succeeding payment due date. The Note also provides for the forgiveness of the entire debt in the event of the payee's death. To secure the Note, Debtors contemporaneously executed a Deed of Trust in favor of Mrs. Angerer covering the real estate Mrs. Angerer transferred to the debtors.

Mrs. Angerer testified that the above transaction was one of three similar transactions she consummated with each of her three children to convey to each a one third share of the family farm. Her intent in doing so was to keep the property in the family. Debtors made 18 monthly payments on the Note of $175.00 each, covering only the interest due. Since making the last payment in 1979, Debtors have not made any payments on the Note, either towards principal or interest, causing unpaid interest to accrue to an amount exceeding $19,846.44. Debtors testified that they do not intend to make any further payments unless they are requested to do so by Mrs. Angerer. Mrs. Angerer testi-

fied that at the time the Note was executed, she did not expect Debtors to make any payments towards the principal balance but simply to pay the interest. She further stated that she has not made a demand for any payment, principal or otherwise, nor does she intend to make any such demand at any foreseeable time. She indicated that as long as Debtors are in financial difficulty, and as long as she does not need the money, she will not demand payment. Mrs. Angerer further testified that she intends to forego the interest that has thus far accrued on the Note. She explained that her acquiescence to Debtors' failure to make any further payments is due to the fact that her daughter recently experienced serious health problems, and that Debtors were having financial problems. Mrs. Angerer testified that her willingness not to demand payments was expressed in the form of a verbal understanding with Debtors and had not been memorialized in any writing.

The Trustee claims in Count I of his Complaint that Debtors executed the Note and Deed of Trust to create the appearance of a valid monetary obligation and lien on their real property in order to defeat the rights of future creditors. At the hearing of May 3, 1989 in this Court upon which all evidence pertinent to the questions presented was adduced, the Court dismissed that portion of the Trustee's Complaint which sought to void the Deed of Trust as an invalid encumbrance upon the Debtors' real estate. The Trustee alternatively requested the Court to declare the entire amount of accrued and unpaid interest on the Note waived or forgiven by the payee, Mrs. Angerer. In support of this motion, the Trustee argues that by their unequivocal mutual conduct, the parties to the Note abandoned the interest obligation therein and, as a result, such interest should not be allowed. Defendant's response is that the Trustee failed to produce any evidence of abandonment or forgiveness and has thus not met his burden of proof.

In Count II of his Complaint, the Trustee seeks to establish that certain personalty in Debtors' possession is, in fact, owned by Debtors and should be included as property of their bankruptcy estate. Such a result should be reached, the Trustee argues, because Debtors' conduct with respect to this personalty manifests an attempt to defraud their creditors. There are two categories of property at issue which, for purposes of simplification, are denoted "equipment" and "cattle." The probative facts presented to the Court on these issues are murky at best and occasionally missing at worst. Nevertheless, the Court finds ample support from the record for the results reached.

The chronology of events that must necessarily be charted with respect to the equipment begins with Lawrence Kempker's desire to turn over his automobile repair business to his son, Roger, and eventually retire. Lawrence took Roger into the business as a partner in 1977 but this partnership only lasted until 1980. Roger left the business and his father retired. Upon Lawrence's retirement, Roger entered into a certain Lease Agreement (hereinafter the "Lease") with his father on or about October 30, 1980 under which Roger would lease a scheduled list of various shop equipment. The complete list, referred to in the Lease as "Exhibit A" could not be located. The record does, however, contain various sources of evidence from which most of the leased equipment can be identified in a piecemeal fashion. Debtors produced a May 10, 1978 sales invoice (Debtors' Exhibit E) evidencing Lawrence's purchase of approximately $5,600 worth of tools and equipment, all of which he testified were part of the leased items. In addition, Roger prepared from memory a list of items that purportedly belong to his father (Plaintiff's Exhibit 1). Finally, an appraisal was completed on all of the equipment in Debtors' possession as of November 5, 1988. Next to each item listed on this appraisal that Roger claims his father owns he placed an "F". For any item in which a third party holds a security interest, he has placed an "S", and for any items belonging to a third party, he has made an identifying notation. Roger claims to own all items not marked.

The Lease, a one page document with the exception of a second page for the parties' signatures, was for a term of six years and called for a rental amount of $100.00 per month. The Lease also granted Roger an option to purchase the subject equipment at its fair market value or a price mutually agreed upon by the parties. The option could be exercised at any time and all rent payments would be applied to the option price. Neither the Lease nor a UCC–1 financing statement pertaining to the leased equipment were ever filed and recorded. The attorney who prepared the lease testified that the equipment had been leased rather than sold to Debtors for tax purposes on the advice of Lawrence's accountant.

Debtors' payment history under the Lease is erratic. The last payment was made in December of 1983. When the Lease term expired in 1986 it was never renewed. Lawrence testified that since that last payment he has not demanded any additional payments because he knew Debtors were financially distressed. Lawrence further stated that he has never demanded return of the leased equipment largely because Roger has allowed him to pasture cattle he claims to own on Roger's property. According to Lawrence, Roger may use the equipment until he can afford to purchase the equipment or until Lawrence needs money. Since entering into the Lease, Roger claims to have bought and sold an unspecified amount of tools and equipment, some of which may or may not have been the subject of the Lease. He did not keep any records of these dispositions. In any event, Debtors state in their bankruptcy filings that they do not hold property for another person.

As to the value of the tools and equipment that have been in Debtors' possession at any one time since entering the Lease, only a general perspective on the possible range of value at stake can be gleaned from the record. Debtors once estimated the equipment's value at $60,000.00 on a personal financial statement submitted in September of 1987 to a local bank for purposes of obtaining a loan (Plaintiff's Exhibit 2). The only appraisal completed on the equipment in Debtors' possession (Plaintiff's Exhibit 4) opines that fair market value of the equipment as of November 5, 1988 was $15,799.20. The total value of those items which Roger marked on the appraisal as belonging to his father was $4,750.00 Roger testified that in his opinion the appraisal overstated the property's fair value. He estimated that the tools and equipment in his possession might gross anywhere from $4,000.00 to $10,000.00 at a public auction. Assuming $10,000.00 were realized, he estimated that the value of the unencumbered items he claimed to own was approximately $2,000. Debtors' individual tax returns for 1983, 1984, and 1987 (Plaintiff's Exhibits 9, 10, and 11) reflect depreciation deductions taken on the tools and equipment in Debtors' possession for those years.

As to the cattle, Lawrence and Roger Kempker both testified that there are 18 cattle on Debtors' property, three of which allegedly belong to Debtors, while the remaining 15 head belong to Lawrence. Lawrence testified that he began pasturing cattle on Debtors' land in 1979 or 1980 with one cow and one calf. He has no record of his purchase of these two animals. He has not purchased any other cattle. To enable Lawrence to expand his herd, Roger allowed his father to use his bull for breeding at no cost. No birth or death records were produced by any party. In connection with his cattle, Lawrence produced personal tax returns for the years 1982–84 and 1987–88 indicating certain farm expense deductions, primarily for feed. The feed deductions taken on these returns range from $836.00 in 1984 to $270.00 in 1987. Lawrence's most recent feed deduction in 1988 was $410.00. The returns also reflect the loss of two cattle in 1984 and the periodic sale of an unspecified amount of cattle. Debtors' individual tax returns for 1983, 1984, and 1987 also indicate farm expense deductions for feed of $1,837.00, $132.00, and $476.00, respectively. To a certain extent, the relatively large amount of cattle sold during these three years as measured in dollar sales corroborates the sharp drop in Debtors' feed expense. Ac-

cording to their returns for these three years, Debtors gross cattle sales were almost double that of what Lawrence reported over five years. As a further reference point, Roger estimated that at one time, in 1977, the maximum size of his herd was approximately 15 head of cattle. At the time of their bankruptcy filing in December of 1988, Debtors estimated the value of their herd at $3,000.00.

## QUESTIONS PRESENTED

1. Whether Debtors' obligation to pay the accrued and unpaid interest due under the Note secured by the Deed of Trust has been waived or abandoned by the conduct or mutual agreement of the parties.

2. Whether the tools and equipment, which were the subject of the Lease and are in Debtors' possession, are property of Debtors and, therefore, property of their bankruptcy estate.

3. Whether any or all of the cattle pastured on Debtors' farm property belong to Debtor and, therefore, are property of the estate.

## DISCUSSION

### I. *The Accrued and Unpaid Interest Obligation*

■ To persuade this Court to exonerate Debtors from the accrued and unpaid interest obligation on the Note, the Trustee has developed a line of argument based on the contract theory of modification by abandonment as manifested by the parties' conduct. Application of this theory to a previously formed contract is appropriate where it is necessary to equitably amend the parties' contractual relations based on their mutual course of conduct. The Trustee cannot

avail himself of this theory, however, with respect to the contract at issue. The reason for this begins with the fact that Debtors' "contract" with Mrs. Angerer is a promissory note and, as such, is a negotiable instrument within the meaning of 400.3–104 of Missouri's Uniform Commercial Code. Consequently, if there was, as the Trustee claims, a gratuitous discharge or abandonment of payment of the unpaid interest, the parties were required to put it in writing pursuant to Mo.Ann.Stat. 400.3–605 (Vernon 1963).[1] *Popovsky v. Griwach,* 361 Mo. 1120, 238 S.W.2d 363, 366 (1951); *Miller v. Gayman,* 482 S.W.2d 414, 419 (Mo.1972); *Smith v. Christopher,* 737 S.W.2d 510, 512 (Mo.App.1987). Section 400.3–605's writing requirement guards against false claims of forgiveness that would impede the otherwise fluid exchange of commercial paper.[2] Further, the public has a judicially favored right to presume that an unambiguous written contract manifests the parties' entire agreement, and nowhere is this more applicable than when it is a promissory note in dispute. *In re Bergmann v. Bergmann,* 740 S.W.2d 215, 216 (Mo.App.1987).

The fact that the implied forgiveness proposed is only of interest, and thus partial, is of no consequence. If a total gratuitous discharge requires a writing, so should any partial discharge. *Id.* Had Debtors given Mrs. Angerer some form of valuable consideration for her voluntary renunciation of the unpaid interest obligation, the statute's writing requirement would not apply. *Brunswick Corp. v. Briscoe,* 523 S.W.2d 115, 122 (Mo.App.1975). The record, however, contains no evidence of such consideration. There was not, for example, a mutual release of contractual duties. *See Tahan v. Garrick, Inc.* 701 S.W.2d 189, 191

---

**1.** Section 400.3–605 provides:

(1) The holder of an instrument may even without consideration discharge any party

  (a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally canceling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

  (b) *by renouncing his rights by a writing* signed and delivered or by surrender of the instrument to the party to be discharged.

(2) Neither cancellation nor renunciation without surrender of the instrument affects title thereto.

(emphasis added).

**2.** Similarly, the Deed of Trust securing the Note is intended under the UCC to pass with the Note, and if held by a holder in due course, the Deed has the same characteristics of negotiability and insulation from secret equities or agreements as does the Note. *Goetz v. Selsor,* 628 S.W.2d 404, 405 (Mo.App.1982).

(Mo.App.1985) (such consideration would support an oral recision of the parties' contract). Nor is there any evidence of accord and satisfaction between the parties as to the interest obligation.

The Court also finds unpersuasive any equitable estoppel argument implicit in the Trustee's brief that would suggest Mrs. Angerer effectively waived her right to the interest payments. First of all, forbearance does not constitute a waiver. *Kroh Bros. Development Co. v. State Line Eighty–Nine, Inc.*, 506 S.W.2d 4, 12 (Mo. App.1974). Moreover, the use of estoppel was rejected under a nearly identical set of facts in *Smith v. Christopher*, 737 S.W.2d 510 (Mo.App.1987). As the *Smith* court explained, estoppel applies only when there is (1) an admission, statement, or act inconsistent with a position or course of conduct later adopted; (2) an action or a change in position by the other party on the faith of such conduct; and (3) injury to the relying party if the first party is allowed to contradict or repudiate its original admission, statement, or act. *Id.* at 513. Even if it is presumed that Mrs. Angerer's statements or conduct caused Debtors to stop paying interest, a dubious presumption given Debtors financial problems, the record reveals no injury to Debtors. Ever since they executed the Note, they have had and continue to have uninterrupted free use of the farm property. And even if injury could be proven, the Court would hesitate to allow the application of equitable estoppel under these circumstances. As the *Smith* court aptly pointed out, the writing requirement for a gratuitous discharge of a negotiable instrument and its purpose could be easily circumvented if estoppel applied in such cases. *Id.* Thus, no matter what the parties' intended by their mutual conduct or what could be inferred from it, such conduct was ineffective as an gratuitous abandonment or renunciation of Mrs. Angerer's right to receive, and Debtors' obligation to pay, the accrued and unpaid interest.

## II. *The Equipment*

The Trustee argues that Debtors are, in effect, utilizing the disputed Lease to defraud creditors by having them falsely believe that Debtors do not own the equipment subject to the Lease. The Trustee asserts that a sufficient confluence of certain "badges of fraud" exist to support this contention. These asserted badges include the absence of a description of the property in the Lease, the lessor's failure to repossess the property upon the termination of the Lease, and the alleged absence of any consideration given by Debtors for the Lease. Additionally, the Trustee maintains that to the extent that the lessor relies on the Lease as evidence of a security interest in the equipment, such security interest is invalid given that it is not perfected in accordance with Missouri law. There are two separate issues presented in this dispute over the rightful ownership of the equipment: (1) whether Debtors' conduct reveals a scheme to defraud creditors, requiring that title to the equipment be found in them; and (2) whether the purported Lease is a "true lease" or a secured transfer of ownership.

No matter how suspiciously the Court views Debtors' conduct with respect to the equipment and the Lease, it cannot find the requisite fraudulent intent to support the Trustee's turnover request. The Court is keenly aware that because fraud can rarely be proved by direct evidence of intent to cheat, such intent may be shown through circumstantial evidence known as "badges of fraud." *Ratchford v. Manchester Life & Cas. Management Corp.*, 679 F.2d 741, 745 (8th Cir.1982). As the Second Circuit observed, "fraudulent acts are as varied as fish in the sea." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983). But the record does not portray, for example, a situation in which Debtors have remained in possession of property that proximate to their insolvency, they conveyed to a close relative for inadequate consideration. *See Matter of Titus*, 75 B.R. 256, 259 (Bankr. W.D.Mo.1985) (outlining these and other recognized badges of fraud). Nor is this an otherwise fraudulent case where the Lease was backdated prior to the bankruptcy. *See, e.g. In Re D.H. Overmeyer Telecasting Co., Inc.*, 53 B.R. 963, 981 (N.D.

Ohio 1984) (backdating of lease prior to bankruptcy was evidence of actual intent to defraud and injure creditors). The Court is troubled though by the fact that while Debtors insist that the equipment was once leased and is not their property, they permitted the property to be reported as a personal asset in a loan application. For the same reason, the Court cannot find much honor in Debtors' declaration in their bankruptcy filing that they hold no property for another. Nevertheless, while the Court finds Debtors' behavior during their possession of the equipment slipshod and somewhat disconcerting, their conduct does not demonstrate a reckless indifference to the truth which can be the equivalent of an intent to defraud.[3] *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir.1969). Further, as Defendants' counsel points out, it is difficult to believe that when his clients entered into this transaction ten years ago—a time at which they were solvent, they did so with a view towards defrauding their creditors.

An alternative theory touched upon but not explored by the Trustee in support of his turnover request concerns the economic substance and reality of the alleged lease transaction between Roger Kempker and his father. Was it a "true lease" or was it a financed installment sale to the "lessee", coupled with a security interest in the "lessor" masquerading as a lease? This requires an evaluation of the economic substance and reality of the transaction, the result of which will be a determination as to the current state of title to the equipment, both legal and equitable. Although the lease term has expired, if the agreement is found to have been a true lease, legal title remained in Lawrence, the lessor. He would thus be entitled to possession of the equipment as it would not be considered property of the estate.[4] *See Matter of Marhoefer Packing Co., Inc.*, 20 B.R. 244 (Bankr.S.D.Ind.1979) (lessor entitled to possession of equipment where lease found to be true lease). If, on the other hand, the agreement is found to be a security interest through which legal title was transferred to Roger, the equipment becomes property of the estate subject to a security interest. *See In re Jester*, 31 B.R. 189 (Bankr.Ky.1983) (if instrument nominally designated as lease which transfers legal title to another who is later adjudicated bankrupt, property becomes property of the estate).

To determine a debtor's property rights, such as an interest in a lease, the bankruptcy court is required to look to state law. *Johnson v. First Nat. Bank of Montevideo, Minn.*, 719 F.2d 270, 273 (8th Cir.1983). Section 400.1–201(37) of Missouri's Uniform Commercial Code defines a "security interest," in pertinent part, as:

[A]n interest in personal property or fixtures which secures payment or performance of an obligation.... *Whether a lease is intended as security is to be determined by the facts of each case;* however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease shall become or has the option to become the owner of

---

3. Although not alternatively raised by the Trustee in connection with his claim of fraud, the Court considered whether Debtors' possession of the equipment under the circumstances constituted a fraudulent loan of personal property in violation of Missouri law. This prohibition is contained in Mo.Ann.Stat. 428.050 (Vernon 1939), which in essence provides that if one pretends to loan personal property to another, and the "borrower" remains in possession of the property for five years without a demand made and pursued by the owner, the "loan" is void as a matter of law and such property is deemed the property of the borrower for purposes of creditors' claims and third party purchasers. For the same reasons the Court is unable to find fraudulent intent in the Debtors, the Court does not

find that the transaction amounted to a loan pretended to have been made within the meaning of 428.050. *See. e.g., In re Ryder*, 78 B.R. 348, 350 (Bankr.S.D.Fla.1987) (applying similarly worded Florida statute).

4. Section 541(a) defines property of the estate to include, in pertinent part:

(1) ... all legal or equitable interests of the debtor in property as of the commencement of the case.

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

(A) under the sole, equal, or joint management and control of the debtor ...

the property for no additional consideration or for a nominal consideration does make the lease one intended for security. (emphasis added).

A number of tests have been developed under the language of this provision to determine whether an agreement is a true lease. Among them, two are instructive to the Court's analysis in this case. The first test involves a comparison between the stated option price to the fair market value of the equipment at the end of the lease term. The more closely the option price resembles the property's fair market value, the more likely the rental charges were intended to compensate the lessor for the loss of value during the lease's term and the option is a real one. *See e.g., Matter of Fashion Optical, Ltd.*, 653 F.2d 1385, 1388–91 (10th Cir.1981). The second test compares the total rental payments to the option price. The contract is deemed a secured transaction if the option price is proportionately small in relation to the aggregate rentals. *In re Beker Indus. Corp.*, 69 B.R. 937, 940 (Bankr.S.D.N.Y. 1987) (citing *In re Oak Mfg., Inc.*, 6 U.C.C. Rep. 1273, 1276 (S.D.N.Y.1969). This guideline is consistent with the so called "economic realities test," which examines whether the terms of the lease and purchase option are such that the only sensible economical course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods. If this is the case, the lease is actually a secured installment sale. *In re Access Equipment, Inc.*, 62 B.R. 642, 646 (Bankr. D.Mass.1986); *see also, Percival Constr. Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 171–72 (10th Cir.1976), *aff'g* 387 F.Supp. 882 (W.D.Ok.1973) (citing this as an important factor). In addition to these tests, the courts have considered a variety of other factors, often called "indicia of ownership," in determining whether a lease is a true lease. Relevant to the instant matter, these indicia include: (1) whether the lessee paid for all repairs, damage, and maintenance, *In re Beker Indus. Corp.*, 69 B.R. at 942; (2) whether the transaction was structured as a lease primarily to secure tax advantages, *In re*

*PCH Associates*, 804 F.2d 193, 201 (2d Cir. 1986); (3) whether the facts show that the lessee is acquiring equity in the leased items during the term of the lease, *In re Access Equipment, Inc.*, 62 B.R. at 646; and (4) whether the lessor expects to receive a residuary interest at the end of the lease term. *In re Beker Indus. Corp.*, 69 B.R. at 942–43.

As to the first test, the Lease provides that the option price shall be the equipment's fair market value at the time the option is exercised or a price mutually agreed upon between the parties. This Court adopts the view of the Tenth Circuit and other circuits that have held that 400.-1–201(37)'s consideration requirement cannot be met merely by providing for such an open "fair market value" option price. *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1391. While this would seem to fix the option price at the fair market value, this falls short of establishing the lease as a true lease. *In re Beker*, 69 B.R. at 941. As the fair market value, and thus the option price, approaches nominalness, an open "fair market value" clause becomes less indicative of the parties' intent to enter into a true lease. The option must require greater than nominal consideration before a true lease is usually found. *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1389. Analysis of the instant case under this test is made uniquely difficult due, in part, to the fact that the option never was exercised. Further, there is some disagreement on the evidence submitted regarding the equipment's fair market value. Roger Kempker's testimony intimated that a narrow and fickle market exists for this type of used equipment. Under the totality of the circumstances, the Court believes that the equipment's fair market value, if anything, has declined over time. Moreover, the Court cannot tell conclusively and with certainty what equipment now in Debtors' possession belongs to who and which items were subject to the Lease. The record does show that the total appraised value of all of the items listed on the November 5, 1988 appraisal (Plaintiff's Exhibit No. 4) was $15,799.20. Of this amount, items

with a total value of $4,745.00 were marked by Roger Kempker as belonging to his father. This may be high because in Roger Kempker's opinion the $15,799.20 figure for all of the listed items was overstated. On the other hand, the $4,745.00 figure is probably too low as an estimate of value for the equipment subject to the lease. This is so because the appraisal apparently picked up most, but not all, items allegedly belonging to Lawrence Kempker that were in Debtors' possession and subject to the Lease. It is often said that this is not a perfect world. The record before the Court certainly does much to champion this philosophy. The Court's inability to determine the fair market value of the "leased" equipment at a given option date prevents a determination as to whether that value constitutes "nominal consideration". Thus, the first test offers little guidance in this case.

■ The second test involves a comparison of the option price to the aggregate rental payments called for under the Lease. While the unknown nature of the option price might seem to preclude such a comparison, the overall record contains enough information from which the Court has concluded that the economic substance of the Lease represents a security agreement. See Matter of Fashion Optical, Ltd., 653 F.2d at 1390 (even in absence of evidence of fair market value, other evidence in record was as consistent with view that secured financing was intended as with view that debtor chose to lease because it could not afford to buy). The Lease, which expired in October 1986, called for total rental payments of $7,200.00. Had these payments been made and the purchase option exercised, the payments would have been applied to the option price. This price was to be the equipment's then fair market value of which the Court acknowledges there is no evidence.

While the record's imperfections prevents the Court from making the exact comparison contemplated under the second test, the evidence, when considered in its entirety, reveals that the economic reality of the parties' agreement is not what they would have the Court believe. Had all rent been paid and the option exercised at the end of the lease, the Court is of the opinion that the $7,200.00 credit would have closely equated, if not exceeded, the fair market value of the equipment, i.e. the purchase price, at the time. From a purely economic point of view, the only sensible choice for Debtors would have been to exercise the option under which they would pay little or no consideration to become owners of the equipment. An important consideration in determining whether the Lease is intended as a security is the intention of the parties. Such intent must necessarily be measured by an *objective standard* because the parties' subjective view of their transaction cannot make a true lease where the economic realities indicate a secured installment sale. *In re Anton's Lounge & Restaurant, Inc.*, 40 B.R. 134, 136 (Bankr.E.D. Mich.1984). The intent under this agreement was, in effect, to permit the "lessee" to build up equity in the equipment rather than to compensate the "lessor" for the use of the property. To paraphrase the words of Shakespeare, a secured transaction by any other name is still a secured transaction. *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1390 (citing Romeo and Juliet, act III, sc. 2, 1. 43 (1596)). This principle is recognized in 400.1–201(37) of the UCC.

Additional indicia of ownership displayed by Debtors further support the Court's finding. Debtors assumed certain obligations and benefits typically associated with outright ownership of the property. The evidence indicates that Debtors took care of any repairs, damage, and maintenance of the property. The most notable benefit Debtors received were the tax deductions they claimed on their personal income tax returns for depreciation on the equipment. While the Court does not have the accounting background of a C.P.A., it knows that it is not proper for one to claim depreciation on property that one does not own. Debtors also claimed ownership of the equipment on a personal financial statement for purposes of obtaining a loan from a local bank. Whether this was done inadvertently or intentionally matters little—they both signed this document and there is

no evidence that they did so under any undue influence or without an opportunity to review its contents. Further indicia of ownership is the fact that the transaction was set up as an ostensible lease for tax purposes upon the advice of Lawrence's accountant. There is also no evidence that Lawrence Kempker expects to receive or assert any residuary or other interest in the equipment. If anything, the terms of the transaction suggest that the parties intended that the lessee acquire a proprietary interest in the equipment. In addition, there were no warranties made by the lessor to the lessee. These facts are distinctive characteristics of a lease disguised as a financing transaction. *In re Tillery*, 571 F.2d 1361, 1365 (5th Cir.1978); *see also In re Anton's Lounge & Restaurant, Inc.*, 40 B.R. at 136 (summarizing these and other indicia of ownership consistent with a proprietary interest in "leased" property). The economic reality of the transaction is clear. Upon his retirement from the auto shop business, Lawrence had little use for the equipment. Roger, on the other hand, could put the equipment to use and the Lease was an affordable means by which he could purchase the equipment.

Finally, the Court places some weight on the fact that Debtors have been in rent free possession of the equipment for more than three years since the expiration of the lease term. Thus, finding the equipment to be property of Debtors' estate merely validates the Debtors' ownership of the equipment by virtue of their possessory interest. Under Missouri law, possession of personalty is prima facie evidence of ownership. *U.S. v. Kramel*, 234 F.2d 577, 579 (8th Cir.1956). In particular, where such possession is coupled with exclusive control over personal property, a presumption of ownership in the possessor is raised and anyone else claiming the property has the burden of proving ownership. *Valentine v. St. Louis Union Trust Co.*, 250 S.W.2d 167, 171 (Mo.1952). The fact that neither the Lease nor any UCC–1 type financing statement was filed may have a bearing on whether Lawrence Kempker's security interest in the equipment is perfected, but it does not affect the agreement's validity or the analysis or resolution of the issue before the Court.

### III. *The Cattle*

From all of the facts and circumstances relevant to the issue of Defendants' respective ownership of cattle, the Court has determined that they own what they say they own. As with the equipment, Debtors' recordkeeping relevant to the cattle is incorrigible but the evidence does not justify a finding of fraudulent intent. The Court finds the Defendants' claims of ownership credible, in part, due to their non-conflicting testimony on the historical sizes of their respective herds. This is corroborated to a certain extent by a rough comparison of their tax returns. What limited evidence there is of their respective cattle sales tends to support their claim that Debtors currently own only three of the eighteen cattle pastured on their property, while Lawrence Kempker owns the remaining fifteen. Compared with Lawrence's returns, Debtors' returns reflect a pattern of a greater dollar volume of cattle sales prior to their bankruptcy. The Trustee has not refuted any of this evidence. An additional basis for the Court's conclusion is that it finds plausible Lawrence Kempker's testimony that his son had allowed him to pasture his cattle rent free on his son's property as a favor to him. The believability of this is enhanced by the fact that the son has not made a single payment under the now expired Lease since 1983, and the father has not made any demand for payment. The Court has tried but cannot make a meaningful comparison of Lawrence's and Debtors' feed expense deductions. Perhaps put most simply, neither party to this action produced sufficient evidence to convince the Court of anything. Since it is the Trustee's burden, Lawrence Kempker in effect wins by default.

### CONCLUSION

Debtors remain obligated for all accrued and unpaid interest due under the Note executed by Debtors in favor of Mrs. Angerer and secured by the Deed of Trust. The Note is a negotiable instrument within

the meaning of 400.3–104 of Missouri's Uniform Commercial Code and, as such, any discharge of the obligation is subject to the UCC's requirements. The record contains no evidence of a writing memorializing any gratuitous renunciation, discharge, or abandonment of this interest obligation as required under 400.3–605 of the UCC. This obligation is, therefore, an allowed secured claim of Debtors' estate and Trustee's motion seeking a declaration waiving said obligation is DENIED. Although the record does not support the Trustee's claim of fraud with respect to the Lease, the Court finds that the economic substance and reality of the transaction was that of a security agreement as defined by 400.1–201(37) of the UCC. The record further contains sufficient indicia of ownership displayed by Debtors with respect to the equipment to support this finding. The Court, therefore, GRANTS the Trustee's request that the property which can be identified as subject to the Lease be declared property of the estate. The Trustee's request that the eighteen cattle in Debtors' possession be declared property of the estate is DENIED. The evidence does not demonstrate, by inference otherwise, that Defendants had an intent to defraud. The Court finds on the record that three head of cattle are owned by Debtors and the remaining fifteen are owned by Lawrence Kempker.

SO ORDERED.

The foregoing Memorandum Opinion constitutes Findings of Fact and Conclusions of Law as required under Rule 7052, Rules of Bankruptcy.